CHRYSLER CORPORATION *v.* THE REVIEW BOARD OF THE INDIANA EMPLOYMENT SECURITY DIVISION ET AL.

[No. 18,029.   Filed May 22, 1950.   Rehearing denied June 15, 1950.]

426

Martin, J., dissents.

*Scotten & Hinshaw,* of New Castle, for appellant.

*Taylor, Kurrie & Quinn,* of Indianapolis, for appellees.

ROYSE, C. J.—This is an appeal from an award of the majority of the Review Board of the Indiana Employment Security Division granting certain employees unemployment compensation benefits for the week ending June 5, 1948. (Hereinafter the appellant will be referred to as the employer, the Review Board as the Board, and the other appellees as the employees.)

The Board's statement of fact may be summarized as follows: The employer operates a large manufacturing plant in New Castle. A dispute on a national scale between the employer and U. A. W.-C. I. O. over wages and working conditions affecting production and maintenance employees resulted in a strike effective May 12, 1948 on which day production ceased and was not resumed until June 7, 1948.

It was stipulated by the parties that all the employees herein were participating or directly interested in the strike which existed at the employer's New Castle plant from May 12, 1948 to midnight May 28, 1948. The issue is confined to the eligibility of these employees for benefits for the week ending June 5, 1948.

The employer contends the stoppage for said week was caused by a stoppage of work due to the labor dispute for the weeks ending May 15th, 22nd and 29th, 1948; that their inability to start full scale operations on June 1, 1948 was caused by the necessity of examining and checking its machinery and equipment to determine its condition and to bring the heat up in the furnaces to the proper temperature.

The employees contend they are entitled to benefits for said week because of their availability for work and that their unemployment was due to the employer's acts of delay in not having its said plant ready for operation for said week ending June 5, 1948.

After receiving notice of the strike settlement the plant manager called his top supervisors to a conference at the plant at 7:30 A. M. May 29, 1948 to discuss the resumption of operations. It was there decided to prepare the plant for the start of full production on Monday, June 7, 1948.

Conflicting testimony was offered by the parties as to how long it would take to prepare the plant for full production. This testimony was based on speculation because the conditions existing at the time had never existed before. The plant could not be in production while an inventory was being taken. When the strike was settled this plant was in the middle of an inventory which was commenced a few days before the strike ended. The necessity for the inventory was not the result of a labor dispute and it was not completed until June 3, 1948.

The employer made no effort prior to June 1st to prepare its plant for resumption of work. The employees were available for work for the week ending June 5th and none of the production or maintenance men refused to report for work when called or in any

way signified their unwillingness to work any time subsequent to midnight May 28, 1948.

Upon the foregoing statement of facts a majority of the board, one member dissenting, found the employees were entitled to benefits for the week ending June 5, 1948.

Originally this case involved two classes of employees—veterans and non-veterans. The first hearing before the Referee included both classes. The Referee found in favor of both classes. As heretofore indicated, the Board in this case affirmed the award of the Referee. In the veterans' case the Readjustment Allowance Agent for Indiana reversed the award of the Referee.

Appellant contends here the award of the Board is contrary to law because the undisputed facts show that all the "make ready" work done by appellant during the week ending June 5, 1948 was necessary to place the plant in operating condition; that it was necessary to do this "make ready" work because of a labor dispute caused by the fact the employees union had withdrawn all power house and maintenance employees from its plant during the period of the strike; that no more time was used on this work than was reasonably required to physically resume normal operations at the plant.

There is no serious dispute between the parties as to the law which governs this case. The real question before us is: Are the facts in the record sufficient to sustain the award? We do not deem it necessary to cite authority to the proposition that if there is any substantial evidence to support the award, or if the reasonable inferences therefrom sustain the award, it is our duty to affirm.

With that rule as our guide, we proceed to a consideration of the facts as disclosed by the record and the law applicable thereto.

The employer's plant manager was advised from Detroit between 10:30 and midnight May 28th that the strike had been settled. He immediately made an effort to get in touch with some of the key supervisors. He could not get these men until early Saturday morning, May 29th, when a meeting was held in the plant. The meeting started about 7:30 A. M. They discussed plans for getting the men into the plant as soon as possible. Under the Union Constitution, before a strike can be called off such action must be approved by a secret majority vote of the local. In a conference with a senior officer of the Union prior to the strike, the employer's plant manager told this officer that if the Union did not permit the power house men and maintenance employees to enter the plant it would undoubtedly delay the re-opening of the plant for production. When the strike was called the Union refused to permit power house or maintenance men to enter the plant. In previous strikes these employees were permitted in the plant. It was the first time in the plant's experience that all of the boilers had been cold at the same time and all of the power shut off. One employee of the heat treat division said his department had been completely closed down before. The regular work week at the plant was Monday through Friday. Monday, May 31, 1948, was one of the named legal holidays in the working agreement between the Union and the employer. Before the plant could be opened for production the power house had to be placed in operation, the boilers cleaned and heated, and a general inspection of various machinery had to be made. This required men who were experienced in this work. On Saturday morning the employer did not know the whereabouts of such employees. It was known from experience the men did not like to work on Saturdays, Sundays and

Holidays. Because they had never been confronted with a similar situation the employer's supervisors were unable on Saturday to estimate definitely how long it would take to have the plant ready for production. Confronted with these conditions it was decided at the Saturday morning meeting to call the particular men required to get the plant prepared for production back to work on Tuesday, June 1st. To insure that these men would get notices the employer arranged with the New Castle Post Office to delay the start of its rural route carriers one-half hour Saturday morning. Special delivery cards were sent to employees who lived in New Castle because there was no Saturday afternoon delivery and would be none on Monday, a holiday.

Eleven employees testified at the hearing of these claims before the Referee. Not one of them testified he was available for work on May 29th, 30th or 31st, 1948. The local Union ratified the National settlement at a meeting Saturday afternoon.

The employer usually takes a physical inventory of its plant about June 1st. When the inventory is taken about 2,700 of the plant's 3,000 employees are laid off. When the inventory is commenced it is not stopped until finished. About a week prior to the settlement of the strike the employer commenced the taking of the inventory. It was not completed before the strike ended. A number of production employees were called into the plant to finish this work during the week of June 1st while the power house and maintenance men prepared the plant for production which started the week of June 7, 1948.

For the reasons hereinafter stated, we do not believe these facts are sufficient to sustain the award of the Board.

Section 1504 of the Indiana Employment Security Act (§ 52-1539c, Burns' 1933 (1949 Supp.), provides, in part, as follows:

"An individual shall be ineligible for waiting period or benefit rights: For any week with respect to which the board finds that his total or partial or part-total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he was last employed; Provided, (all exceptions excluded by stipulation)."

The term "week" means a calendar week. Section 214 (52-1526m, Burns' 1933 [1949 Supp.]). By regulation of the Board it means a calendar week ending at midnight Saturday. Regulation No. 807.

With certain exceptions not here material, when unemployment results from a labor dispute an employee is not entitled to the benefits provided for by the Act, so long as his unemployment is the result of such dispute. *Frank Foundries Corporation* v. *Review Board of Indiana Employment Security Division et al.* (1949), 119 Ind. App. 693, 88 N. E. 2d 160, 164 (transfer denied).

Where, as here, a labor dispute causes a work stoppage and as a result of such stoppage it is necessary to make repairs before the plant can resume production on a normal basis, employees involved in the labor dispute are not eligible for the benefits of the Act for unemployment during the time reasonably necessary to prepare the plant for normal operations. However, as stated by Judge Bowen of this Court in the case of *Carnegie-Illinois Steel Corporation* v. *Review Board of Indiana Employment Security Division et al.* (1947), 117 Ind. App. 379, 392, 72 N. E. 2d 662:

"The test is not the resumption of operations by reason of the control or decision of the employer, or conditions and speculative factors allegedly asserted by the employer. It must be limited to the delay directly and proximately caused by the labor dispute and the physical factors and conditions created as the direct and natural consequences of the labor dispute."

Where unemployment is originally caused by a labor dispute, before an employee will be entitled to the benefits of the Act, he has the burden of proving that his continued unemployment is not the result of the labor dispute, but is caused by some other condition beyond his control. *Frank Foundries Corporation* v. *Review Board, etc., supra; Auker et al.* v. *Review Board, Indiana Employment Security Division et al.* (1947), 117 Ind. App. 486, 494, 70 N. E. 2d 29, 71 N. E. 2d 629 (transfer denied) ; *Employees of Utah Fuel Co. at Clear Creek* v. *Industrial Commission* (1940), 99 Utah 88, 104 P. 2d 197.

On the record before us in this case, the conclusion is inescapable that the employer did everything that was reasonably possible to promptly restore its plant to a normal production basis. Many hours before the employees' Union had ratified the settlement made in Detroit the plant manager and supervisors met to prepare for a prompt resumption of work. It was their considered judgment that it would be impossible to get a sufficient number of properly qualified employees to have the plant ready before the first work day of the next week. It is significant that none of the employees in this case testified that they were available for work on May 29th the last day of the week, or for that matter, on any of the other days involved herein. While there is a conflict in the evidence as to the length of

time it would reasonably require to make the plant ready for production, it is undisputed that it would require at least some time in the work week commencing June 1st. Therefore, the employees, under the rules hereinbefore set out, were ineligible for benefits during the week ending June 5, 1948.

There is not a scintilla of evidence that the completion of the inventory was in any way responsible for the work stoppage herein. On the contrary the decision to take the inventory at such time indicates a purpose to avoid the usual shut-down occurring on such occasions.

The award of the Board is reversed.

Martin, J., dissents.

NOTE.—Reported in 92 N. E. 2d 565.