Bako Unemployment Compensation Case.

Argued April 15, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Howard C. McWilliams, Jr.,* with him *McWilliams & Margolis,* for claimants, appellants.

*William L. Hammond,* Special Deputy Attorney General, with him *Robert E. Woodside,* Attorney General, for Unemployment Compensation Board, appellee.

*William H. Wood,* with him *Leon D. Metzger* and *Hull, Leiby & Metzger,* for employer, intervening appellee.

OPINION BY RENO, J., July 17, 1952:

This is an appeal by 624 claimants from a decision of the Unemployment Compensation Board of Review, wherein the employer, Bethlehem Steel Company, was permitted to intervene as an appellee. The claims of some appellants were dismissed because they had not filed timely appeals from the initial determinations of the Bureau, the Board holding, under the evidence, that the claimants were not misled by statements of the compensation authorities. The claims of others were denied because the claimants were disqualified for benefits by the Unemployment Compensation Law, §402(d), 43 P.S. §802, which provides: "An employe shall be ineligible for compensation for any week . . . (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lockout) at the factory, establishment or other premises at which he is or was last employed: . . ." Since we are holding that all appellants were disqualified under §402(d), we draw no distinction between them and, for the purposes of this decision, treat all of them as though they had followed the procedural requirements of the Law.

Appellants were members of the United Steelworkers of America, C. I. O., or of the bargaining unit

involved in the strike, and were employed in the wheel plant of the Bethlehem Steel Company at Johnstown. The wheel plant, as the evidence and findings indicate, is one unit of an integrated mill, dependent for its power upon the operation of other departments, and was necessarily involved in the work stoppage.

On July 17, 1949, the collective bargaining contract between the steel companies and the United Steelworkers expired and the parties did not immediately negotiate a new contract. Because of the intervention of the President of the United States, a proposed strike was twice postponed. The dead line for the strike was finally fixed at 12:01 a.m. of October 1, 1949 and, as a result, a work stoppage existed at Johnstown from that time until 12:01 a.m. of November 1, 1949. Prior to the effective date of the strike, on or about September 28th, the company, in anticipation of the strike, began a gradual shut down of its operations. The wheel plant was scheduled for closing on September 29th at 3:00 p. m., after which time electric power would not be available, although some parts of that plant were closed as early as September 28th. In respect to this period, the Board found: "7. . . . The three-day tapering-off period from September 28 to 30, inclusive, was necessary to permit the orderly cessation of operations of the highly integrated steel plants and to circumvent substantial damage to expensive equipment and installations otherwise threatened. Reduction of personnel proceeded in accordance with the shutdown of various machinery, equipment and installations."

The strike was ended under a collective bargaining agreement executed on October 31st which provided, inter alia: "The employes who were on September 30, 1949, in the payrolls of the Company will be returned to work as soon as the orderly resumption of operations

will permit." As to the period following the cessation of the work stoppage, the Board found: "10. During the period from November 1 to 7, 1949, inclusive, the Company resumed operations according to a gradual and integrated over-all basis throughout its plants. This consisted of starting up coke ovens to supply coke to the blast furnaces and gas to various plants, the latter for use in operating steam plants which, in turn, operated electric power generating units which furnished current to other electric operated equipment and installations. Due to the necessity of achieving a balance between coke and coke gas production, involving a gradual buildup of the coke ovens, electric power could not be made available to the wheel plant until Saturday, November 5, 1949. Additional maintenance work and preparation efforts were required on November 5, 6 and 7 to permit wheel shop production work involving the cutting and processing of steel products on November 8, 1949. A maximum of 46 men was utilized in the wheel plant from November 1 to 6, inclusive, 138 on November 7 and 464 on November 8, 1949, at which time the normal employee complement was maintained and normal operations resumed. Thereafter, relatively normal wheel plant operations were underway throughout November, with the exception of a reduced-operations period from November 21 to 28 varying from 30 to 60 percent of normal."

One of appellants' contentions is that they were laid off prior to the inception of the strike because of lack of orders and overstocking of parts and that since there would have been no work for them during the strike their unemployment was due to lack of work. The Board's finding, which follows, negatives the contention: "9. Immediately prior to the commencement of the strike on October 1 the Company had sufficient orders to provide work for its full employee comple-

ment. Immediately following settlement of the strike on November 1 Company orders on hand as of the commencement date of the strike were available to provide employment for the normal employee complement as soon as operations could be resumed."

Appellants argue that several findings contravene testimony which they introduced at the hearing before the Board. There were conflicts in the testimony, and it was the duty of the Board to resolve them, to determine the credibility of witnesses, the weight of the testimony, and to draw reasonable inferences from it. Appellate review is performed by considering the testimony in the light most favorable to the party in whose favor the Board has found, giving that party the benefit of every inference which can be logically and reasonably drawn from it. *Stillman Unemployment Compensation Case,* 161 Pa. Superior Ct. 569, 56 A. 2d 380. Moreover, where the Board's decision is against the party upon whom rests the burden of proof the question on appellate review is whether the Board's findings of fact are consistent with each other and with its conclusions of law and its order, and can be sustained without a capricious disregard of competent evidence; unless the answer is in the negative, the order must be affirmed. *Lavely Unemployment Compensation Case,* 163 Pa. Superior Ct. 66, 60 A. 2d 352. A demonstration that the findings are supported by competent and substantial evidence would extend this opinion to inordinate lengths. It is sufficient to state that a thorough examination of the testimony has produced the firm conviction that the findings are amply supported by evidence of the required quality. Consequently they are binding upon this Court. Law, supra, §510, 43 P.S. §830. The ultimate conclusion, based upon evidentially supported findings, is that the work stoppage was due to a labor dispute, not to a lack of orders or other causes.

The disqualification enacted by §402(d) is not limited to the time appellants were on strike but includes also the period preceding the strike during which the employer, in anticipation of the strike, curtailed operations and employment in order to protect his property. This point was decided in *Lavely Unemployment Compensation Case,* 166 Pa. Superior Ct. 481, 485, 72 A. 2d 300, where this Court said: "[W]hen a strike is imminent, when an employer has been officially notified that a strike will occur, and has reasonable grounds for a belief that the strike will actually take place, he may, prior to and in anticipation thereof, take reasonably necessary measures to protect his property during the pendency of the strike. The nature and extent of such measures depend upon the kind of work and the circumstances in which it is conducted, and ordinarily the board will not overrule the honest judgment of an employer."

The rationale of the second *Lavely* case is applicable also during the time reasonably required to put the plant in normal operation after the strike ends. What is a reasonable period will always "depend upon the kind of work and the circumstances in which it is conducted." In a department store, for instance, resumption of employment might follow the strike's termination in the course of a few hours. Perhaps a textile mill would require a longer time. In an industry, such as Bethlehem Steel, operating several departments which are dependent for power upon a central plant, with equipment to be repaired, machinery cleaned, and other preparatory steps to be taken, a longer time must necessarily be allowed. Possibly, the duration of the strike becomes a relevant factor. At all events, the Board will consider all the circumstances and override the management only when it finds that it failed to exercise honest judgment. It follows that, however

willing employes may be to return to work immediately after the termination of the strike, the continuing stoppage of work must be held to be due to the original labor dispute. For accordant decisions in other jurisdictions on provisions in statutes similar to §402(d), see *Saunders v. Md. Unemployment Compensation Bd.*, 188 Md. 677, 53 A. 2d 579; *American Steel Foundries v. Gordon*, 404 Ill. 174, 88 N. E. 2d 465; *Carnegie-Illinois Steel Corp. v. Review Board*, 117 Ind. App. 379, 72 N. E. 2d 662; *Chrysler Corporation v. Review Board*, 120 Ind. App. 425, 92 N. E. 2d 565.

Appellants rely principally upon the doctrine of res judicata. In two prior cases, in the record called the *Potts* and *Parks* cases, a referee allowed other claims of other employes whose legal position was similar to that of appellants. The employer did not appeal and the Board did not invoke the power granted by the Law, supra, §§502, 504, 43 P.S. §§822, 824, and review the referee's reports sua sponte. Hence they became final and appellants argue that thereby their claims were also adjudicated in their favor.

None of appellants were parties to either the *Potts* or the *Parks* case. In the *Potts* case, 15 claimants, not all of whom were employed in the wheel plant, had filed claims during the strike which the Bureau initially determined were invalid. Each of the 15 claimants filed separate and individual appeals from the Bureau's decision which were heard at one time by the referee who in a consolidated decision, listing all the claimants, reversed the Bureau. See Act of April 23, 1942, P. L. 60, §5, 43 P.S. §825. The Referee ruled that the claimants in this group were entitled to compensation during the various periods involved, under the theory that their unemployment was due to lack of orders at the employer's plant rather than to the work stoppage caused by the steel strike...

The *Parks* case followed the same pattern. In that case there were 109 claimants who filed individual claims for the week ending November 7, 1949, took separate appeals from the initial determinations of the Bureau to the Referee who in a consolidated decision reversed the Bureau as to each claimant. The Referee ruled that the claimants in this group were entitled to compensation for one week because the employer failed to show that, after termination of the strike on November 1, 1949, it was unable to resume operations in its wheel department during the ensuing week, and that claimants' unemployment was due to lack of orders at the employer's plant rather than to a work stoppage resulting from the strike.

The credible evidence, accepted by the Board, sustains the finding that none of appellants were parties to the *Potts* or *Parks* cases; that the claimants in those cases did not represent appellants or any of them; that appellants did not in any way participate in the prior cases and were not successors in interest to the parties in the original proceedings. The *Potts* and *Parks* cases were not class actions, representative suits, or test cases, and the appeals were not mass appeals. They were based upon individual claims and separate appeals, in which each claimant acted for himself alone and did not purport to represent any of appellants. Appellants were in no sense privies to the *Potts* and *Parks* cases. "Except as stated in §§94-111 [none of which is applicable here] a person who is not a party or privy to a party to an action in which a valid judgment other than a judgment in rem is rendered . . . (b) is not bound by or entitled to claim the benefits of an adjudication upon any matter decided in the action." Restatement, Judgments, §93.

Appellants' contention has been adversely decided by this Court in earlier cases. In *Franke Unemploy-*

*ment Compensation Case,* 166 Pa. Superior Ct. 251, 260, 70 A. 2d 461, the appellant's claim was denied by the Board. On appeal he contended that *Von Kaenel Unemployment Compensation Case,* 163 Pa. Superior Ct. 173, 60 A. 2d 586, which arose out of the same labor dispute and in which compensation had been allowed, controlled the decision. President Judge RHODES stated the legal conclusion of this Court clearly and completely, and his definitive pronouncement governs this case: "While the bureau may have considered the Von Kaenel claim as a test case, *there is nothing in the record to indicate that the referee's decision favoring Von Kaenel included any other claims or that the proceedings involved any other than the individual claim of Von Kaenel.* See section 505 of the Unemployment Compensation Law, as amended by the Act of April 23, 1942, P. L. 60, §5, 43 PS §825. The bureau in issuing its decision in the present case on January 12, 1949, on the claim of appellant stated that it covered the other similarly situated claimants, and the board made its decision apply to all the claimants involved. It does not appear that action on claims other than that of Von Kaenel had been previously taken by the bureau or the board. The appeal to this Court by Von Kaenel did not decide the eligibility of other claimants. See McGann Unemployment Compensation Case, supra, 163 Pa. Superior Ct. 379, 381, 62 A. 2d 87. Unless the record in the Von Kaenel case shows that the rights of claimants other than Von Kaenel were adjudicated, *the presumption is that the rights of similarly situated claimants were not passed upon and do not come within the broad principle of res judicata.* Cf. Burns Unemployment Compensation Case, 164 Pa. Superior Ct. 470, 472, 65 A. 2d 445. We find nothing in the record of the Von Kaenel case, or in that of the present appeal, which would make the Von Kaenel decision controlling

as to appellant or the other claimants. Cf. Gollier Unemployment Compensation Case, 162 Pa. Superior Ct. 136, 56 A. 2d 351; section 509 of the Unemployment Compensation Law, as amended by the Act of April 23, 1942, P. L. 60, §5, 43 PS §829." (Emphasis added.)

*Burns Unemployment Compensation Case,* 164 Pa. Superior Ct. 470, 65 A. 2d 445, upon which appellants strongly rely, does not support their contention. There this Court held that a previous decision, *Prentice Unemployment Compensation Case,* 161 Pa. Superior Ct. 630, 56 A. 2d 295, was a *test* case and that, as a *test* case, it controlled *Burns'* separate appeal. That the *Prentice* case was in fact a *test* case was clearly indicated by the decision of the Board, which Judge DITHRICH quoted in his opinion at page 632: "The case of a single claimant has been selected for procedural reasons, viz., to simplify further appellate proceedings which are anticipated. However, while actually deciding only one claim, we include for the purpose of review the basic facts of the entire controversy as it affected all the claims before the Board."

In short, the principle of res judicata operates in multiple or successive claims for unemployment compensation only (1) where the claim of one claimant is selected as a *test* case, as in the *Prentice* case, or (2) where one or more claimants *represent* all similarly situated claimants, as suggested in the *Franke* case, or (3) where by an *agreement* between the Bureau and the claimants "only a small number of representative claims were filed . . . [which] provide a sufficient basis for the adjudication of all phases of the controversy," as in *Stillman Unemployment Compensation Case,* supra, p. 576. Appellants' case, under the findings of the Board, does not fall within any of these categories.

The unfortunate result whereby some employes have been allowed compensation denied to others might have

been prevented by the exercise of the Board's power to review referees' decisions upon its own motions. Possibly, now that the right of the Department of Labor and Industry to appeal from decisions of referees and the Board has been statutorily recognized, an additional safeguard against a similar contretemps has been provided. Act of September 29, 1951, No. 408, §§16, 17, 18, 43 P.S. (1951 Supplement), §§822, 824, 830.

Decision affirmed.