Chappelow Unemployment Compensation Case. Fort Pitt Manufacturing Company, Appellant, *v.* Unemployment Compensation Board of Review.

Argued April 21, 1954. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE and ERVIN, JJ.

*Joseph E. Madva,* with him *Donald W. Ebbert* and *Thorp, Reed & Armstrong,* for employer, appellant.

*William L. Hammond,* Special Deputy Attorney General, with him *Frank F. Truscott,* Attorney General, for Unemployment Compensation Board of Review, appellee.

*M. Rapheal,* with him *Sylvan Libson* and *Weinstock & Tauber,* for claimants, intervenors, appellees.

OPINION BY ERVIN, J., July 13, 1954:

These are appeals by the employer, Fort Pitt Manufacturing Company, from two decisions of the Unemployment Compensation Board of Review which sustained the validity of claims filed by two groups of employes for unemployment benefits for the period between June 5, the date of termination of a strike at the company's plant, and July 1, 1952, the date the plant resumed full operations. It has been agreed between counsel that the appeals be consolidated for disposition in this opinion and that our decision shall determine the eligibility of all other claimants for benefits. Claimants, John Chappelow and Ruth A. Gecy, have been permitted to intervene as additional appellees in the company's appeal.

The facts stipulated under Rule 41 of this Court are summarized as follows: The Fort Pitt Manufacturing Company, located in Pittsburgh, Pennsylvania, is engaged in the manufacture of bedding and automotive products. Approximately 47% of the company's production consisted of automotive products for the International Harvester Company and two divisions of General Motors Corporation. These customer corporations furnished the company with machine tools and dies for the manufacture of their automotive prod-

ucts and also supplied the company with monthly shipping schedules covering their requirements for a period of at least three months in advance. The company had in its employ approximately 396 production employes, of whom 378 were members of, and represented by, United Furniture Workers, CIO, Local 100. The collective bargaining agreement between the union and the company expired on March 31, 1952, without a new agreement having been reached, and the union called a strike effective April 1, 1952, which remained in effect until June 5, 1952, when a new agreement was executed. Because of the strike, the customers for automotive products cancelled shipping schedules for the months of April, May and June and transferred their machine tools and dies to other manufacturers for use during the strike. On Monday, June 9, the company resumed normal operations in all departments of the plant except the automotive production department where normal operations could not be resumed until the company was able to obtain new shipping schedules from its customers and the machine tools and dies were returned. Due to commitments made by them during the strike period the customer corporations were not in position to restore to the company full shipping schedules for the months of June and July. However, they did furnish the company with some orders to ship small quantities. The machine tools and dies were returned near the end of June, 1952. On or about June 9, 1952, the company recalled Ruth A. Gecy and 35 other employes with departmental seniority, but after one day of work the union required the company to dismiss them and substitute other employes with plant-wide seniority. John Chappelow and 46 other employes were not recalled to work at any time during June, 1952. On or about July 1, 1952 all the claimants resumed work in

the automotive production department. Ruth A. Gecy and 35 other employes, as well as John Chappelow and 46 other employes filed claims for unemployment compensation for the period between June 5 and July 1, 1952. The Bureau ruled that the claims were valid and allowed benefits, entering findings in each case that the plant was in operating condition and that the claimants' unemployment was due to "lack of orders." The company appealed and the Referee, after hearing, reversed the Bureau in each instance and denied the benefits, ruling that the unemployment in question was "due to a stoppage of work which existed because of a labor dispute at the establishment where the claimant was employed within the meaning of Section 402(d) of the Law." On further appeal the Board of Review reversed the Referee in each case and allowed benefits, ruling, inter alia, that the claimants were not disqualified under Section 402(d) of the Law, that the "disqualification of the claimants after a cessation of a strike must be limited to the time required to physically resume normal operations" and that the lack of work subsequent to the settlement of the strike could not be ascribed to the claimants.

The fundamental issue presented by these appeals is whether claimants are entitled to unemployment compensation benefits for a period, following the conclusion of a strike, during which the employer is unable to resume normal operations.

Section 402(d) of the Unemployment Compensation Law as last amended by the Act of May 23, 1949, P. L. 1738, 43 PS §802, provides that:

"An employe shall be ineligible for compensation for any week . . . .

"(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment

or other premises at which he is or was last employed . . . ."

Under Section 402(d) the disqualification is not limited to the time a claimant was on strike but includes the time after the strike reasonably required to restore the employer's plant to normal operation. *Polinchak Unemployment Compensation Case,* 175 Pa. Superior Ct. 181, 103 A. 2d 273. Also pertinent here is the statement in *Bako Unemployment Compensation Case,* 171 Pa. Superior Ct. 222, 90 A. 2d 309, cited with approval in the *Polinchak* case, supra, where Judge RENO, speaking for this Court, said: "The rationale of the second LAVELY case is applicable also during the time reasonably required to put the plant in normal operation after the strike ends. What is a reasonable period will always 'depend upon the kind of work and the circumstances in which it is conducted.' In a department store, for instance, resumption of employment might follow the strike's termination in the course of a few hours. Perhaps a textile mill would require a longer time. In an industry, such as Bethlehem Steel, operating several departments which are dependent for power upon a central plant, with equipment to be repaired, machinery cleaned, and other preparatory steps to be taken, a longer time must necessarily be allowed. Possibly, the duration of the strike becomes a relevant factor. At all events, the Board will consider all the circumstances and override the management only when it finds that it failed to exercise honest judgment. It follows that, however willing employes may be to return to work immediately after the termination of the strike, the continuing stoppage of work must be held to be due to the original labor dispute."

In sustaining the validity of the claims involved in these appeals on the premise that ineligibility for bene-

fits following a strike is limited to the time required by an employer to physically resume operations, the Board relied on *Carnegie-Illinois Steel Corporation v. Review Board,* 72 N.E. 2d 662 (Ind. 1947), wherein the following statement appears: ". . . we wish to further assert that by this opinion we do not mean to hold that the stoppage of work caused by a labor dispute continues in every case until the employer resumes normal operations. The test is not the resumption of operations by reason of the control or decision of the employer or conditions and speculative factors allegedly asserted by the employer. It must be limited to the delay directly and proximately caused by the labor dispute and the physical factors and conditions created as the direct and natural consequences of the labor dispute. The stoppage of work caused by a labor dispute under such circumstances must not exceed the time which is reasonably necessary and required to physically resume normal operations in such plant or establishments." However, under the agreed facts in the instant appeals the company obviously was physically unable to resume normal operations in the automotive production department in June, 1952 because it no longer had the necessary tools and dies which had been removed following the commencement of the strike. These tools and dies were not returned, as the Board found, until the end of the month. The statement of the Board in its discussion that "the main issue is not one of physically preparing the plant for normal operations, for the plant was physically able to resume normal operations . . . ." is, therefore, contrary to the Board's own findings of fact. The Board found that the company's automotive products customers "at the outset of the strike period, removed certain dies and tools owned by them, which were used in the manufacture of products for them, and these

tools were not returned until near the end of June, 1952" and that the claimants were not recalled to work in June, 1952 not only because of "lack of orders" but also because of "the removal by these two companies of certain machine tools and dies." Obviously, the Board did not consider the return of the tools and dies a prerequisite to resumption of normal operations in the automotive products department. However, we consider the recovery and setting up of the machine tools and dies *which were essential to the resumption of production in the automotive products department* as no less activities in the nature of the physical preparation of the plant than the preparing, adjusting, or setting up of other equipment or machinery, or than the relining and reheating of furnaces. See *Polinchak Unemployment Compensation Case,* supra. Furthermore, under the circumstances, it is readily apparent that the removal of the tools and dies and their nonavailability when the strike was concluded was a direct and natural consequence of the labor dispute.

Moreover, in determining what constitutes a reasonable period to restore the plant to normal operations we must consider the kind of work and the circumstances in which it is conducted. Thus we find International Harvester Company and two divisions of General Motors Corporation taking 47% of the company's production on the basis of requirements contracts covering specialized automotive parts made to the customer's specifications and manufactured by the use of machine tools and dies owned by the customers and furnished to the company for its use in fulfilling the contracts in accordance with shipping schedules planned to meet the customer's needs. Therefore, when the Board finds that "as a result of the labor dispute, the automotive customers of the employer concern removed their dies and purchasing schedules from the

plant and turned them over to other companies that were operating", the time reasonably required to place the automotive production department back into normal operation after the strike must necessarily cover the period required to effect the return of the necessary tools and dies and the reestablishment of shipping schedules. Furthermore, it has been held that the period during which a stoppage of work caused by a labor dispute may be considered to exist is not limited by the time following a strike required to physically rehabilitate the plant but may include the time required to regain production curtailed as the direct result of the work stoppage. In affirming the determination of the Board of Review that claimant-appellants were disqualified for unemployment compensation benefits under the provisions of a statute similar to that involved here, the Superior Court of New Jersey, Appellate Division, in *Ablondi et al. v. Board of Review*, 8 N. J. Super. 71, 73 A. 2d 262, stated: "As a result of the labor dispute there was a substantial curtailment in production at the employer's plant ever prior to any of the lay offs. By the close of March only 10% of the normal amount of furs was in process; the authorities cited have recognized much lesser curtailment as sufficient to constitute stoppage within the statute. And although the labor dispute ended on June 15, 1948, this stoppage continued until June 30, 1948, when, under the finding of the Board, substantial production was first resumed. This delay occurred despite the diligent efforts of the employer to resume full production and may properly be said to have resulted directly from the labor dispute."

On the basis of the stipulated facts and what we conceive to be the proper interpretation of the law applicable thereto, the unemployment in June, 1952 of the claimant-appellees and the other employes repre-

sented by them must be held to be due to a stoppage of work which existed because of a labor dispute at the plant of the company within the intendment of §402(d) of the Unemployment Compensation Law.

Decisions in both cases reversed.

Ross, J. dissents.