General Motors Corporation Unemployment Compensation Cases.

Argued April 4, 1973, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*John W. McIlvaine,* for appellants.

*Sydney Reuben,* Deputy Attorney General, with him *Israel Packel,* Attorney General, for appellee.

*John G. Wayman,* with him *Scott F. Zimmerman, John T. Tierney, III,* and *Reed, Smith, Shaw & McClay,* for intervenor.

OPINION BY PRESIDENT JUDGE BOWMAN, June 12, 1973:

These are appeals from decisions and orders of the Unemployment Compensation Board of Review reversing a referee's allowance of appellants' claims for compensation.

The claimant-appellants, members of Local 544, United Auto Workers, are employed by the Fisher Body Division of General Motors Corporation at a stamping plant (hereinafter, the "Pittsburgh plant") located in West Mifflin, near McKeesport, Pennsylvania. The function of this stamping plant is to produce component sheet metal parts of automobile bodies preparatory to shipment by rail to various customer assembly plants. On September 14, 1970, at 11:59 p.m., Local 544 initiated a work stoppage because of labor disputes at the Pittsburgh plant and at other General Motors facilities throughout the country. Pickets were maintained by Local 544 on an active basis from September 15, 1970, at 12:01 p.m., until November 13, 1970. The International United Auto Workers and General Motors Corporation reached a tentative agreement on all national issues on November 11, 1970. Following membership ratification, the agreement became effective November 23, 1970. On that date, however, a number of plants had not yet resolved local disputes. Local agreements generally were reached sooner with the fabricating and parts plants (Fisher Body Division) than with the car and assembly plants. Local 544 at the Pittsburgh plant had accepted the local and national agreement on November 13, 1970. The work force there was recalled as follows:

(1)  November 16—30 maintenance men;

(2)  November 17-20—as of November 20, 179 maintenance men had been recalled;

(3)  November 23—112 production employees were added;

(4) December 3—the entire work force of approximately 1600 men was recalled.

General Motors acknowledges the fact that the Pittsburgh plant was in readiness for full operations as of November 23.

General Motors and the International Union entered into a memorandum dated November 13, 1970, which provided as follows:

"MEMORANDUM RE: CALL BACK OF EMPLOYES AFTER EFFECTIVE DATE OF NATIONAL AGREEMENT

. . . .

"WHEREAS striking GM employes represented by the Union who are covered by the ratified Agreement will fall into the following categories at the time such Agreement becomes effective:

"Category I—Employes of both 'struck' and 'exempt from strike' plants in which local demands and issues have been settled;

"Category II—Employes of 'struck' plants in which local demands and issues have not been settled;

"Category III—Employes of 'exempt from strike' plants which are operating but in which local demands and issues have not been settled: and

"WHEREAS it will be both impractical and impossible for the struck plants, because of the effects of the nationwide strike and because of the continuing strike action at certain other plants, to resume operations simultaneously with the new collective bargaining Agreement becoming effective:

"NOW, THEREFORE, it is mutually understood and agreed that:

"As a general and basic approach, upon notification of ratification of the new National Agreement, employes will be recalled to their jobs as soon as the orderly start-up of operations permits, *it being understood that the start-up of operations at some locations may be delayed by reason of continuing strike action by the Union at other locations.*

"In implementation of such approach:

"1. Each employe in Category I above will be called, and will return, to work *as soon as circumstances and conditions permit.*

"2. Plants of Category II employes will continue to negotiate with respect to unresolved local demands and issues, but employes will return to work in accordance with understandings reached locally *as soon as circumstances and conditions permit. . . ."* (Emphasis added.)

Appellants filed claims for unemployment compensation for the period November 16-December 2, 1970. The Bureau of Employment Security held the claimants ineligible for any benefits. On appeal to the referee, a hearing was held; as a result, the referee held that claimants were entitled to benefits for the period starting November 23 through December 2. This order was further appealed to the Unemployment Compensation Board of Review (hereinafter, the "Board") which denied benefits for the entire period, thereby reversing the referee in part and providing the basis for the appeal now before this Court.

The issue before us concerns the period of disqualification during which an employee is not entitled to benefits. Such ineligibility is set forth in Section 402 of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess., P. L. (1937) 2897, as amended, 43 P.S. §802, which provides, *inter alia:*

"An employe shall be ineligible for compensation for any week—

. . . .

"(d)  In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed. . . ."

Before discussing the substantial case law focusing on the period of disqualification, we must note our limited scope of review in this type of case. We have stated on various occasions that findings and decisions of the Unemployment Compensation Board of Review supported by substantial evidence (and absent an error of law or a showing of fraud) must be affirmed. *C. A. Wright Plumbing Company v. Unemployment Compensation Board of Review,* 6 Pa. Commonwealth Ct. 45, 293 A. 2d 126 (1972); Act of December 5, 1936, Second Ex. Sess., P. L. (1937) 2897, §510, as amended, 43 P.S. §830, repealed in part by Section 508(e) of the Act of July 31, 1970, P. L. 673, 17 P.S. §211.508(e).

Given this range of inquiry, we must decide whether or not there was substantial evidence to support the Board's denial of benefits based on its application of the oft-cited[1] principle enunciated in *Bako Unemployment Compensation Case,* 171 Pa. Superior Ct. 222, 90 A. 2d 309 (1952). Citing the decision in *Lavely Unemployment Compensation Case,* 166 Pa. Superior Ct. 481, 72 A. 2d 300 (1950), which dealt with an employer's curtailment of production in anticipation of a strike, the Superior Court stated, "The rationale of the . . . *Lavely* case is applicable also during the time reasonably required to put the plant in normal operation after the strike ends. What is a reasonable period will always 'depend upon the kind of work and the circumstances in which it is conducted.' . . . Possibly, the duration of the strike becomes a relevant factor. At all events, the Board will consider all the circumstances and override the management only when it finds that it failed to exercise honest judgment. It follows that, however willing employes may be to return to work

---

[1] See *Mosko Unemployment Compensation Case,* 199 Pa. Superior Ct. 73, 184 A. 2d 395 (1962); *Polinchak.Unemployment Compensation Case,* 175 Pa. Superior Ct. 181, 103 A. 2d 273 (1954).

immediately after the termination of the strike, the continuing stoppage of work must be held to be due to the original labor dispute." 171 Pa. Superior Ct. at 228-29, 90 A. 2d at 312. Recently, this Court has approved the reasoning in *Bako—Stewart v. Unemployment Compensation Board of Review*, 5 Pa. Commonwealth Ct. 145, 289 A. 2d 529 (1972).

Was there substantial evidence to support the Board's conclusion that the failure of the Pittsburgh plant to recall its entire work force prior to December 3, 1970, was due to the original labor dispute? Was this a "reasonable" period for resumption of operations? Did the management exercise honest judgment? Our examination of the evidence compels affirmative responses to all these questions.

Essential to the resolution of this case is the nature of the Pittsburgh plant's operations. A member of the General Motors Central Office Labor Relations Staff testified that as of November 23, 1970, when the national agreement went into effect, a number of General Motors units were yet on strike, many of which were assembly plants. Although the figure was not clearly established by any of the evidence, apparently some of the Pittsburgh plant's customer assembly plants were those which were yet on strike. It was further testified that almost all of the Pittsburgh plant's yearly production was directed towards these customer assembly plants. This relationship between the striking customer plants and the Pittsburgh plant is crucial. The Superintendent of Production Control, Material Control and Traffic at the Pittsburgh plant testified that prior to the strike the "pipeline," which is the collective term for the storage areas and railroad boxcars used to ship parts to the customer plants, was full and, thus, when the strike ended the Pittsburgh plant had to wait to resume production until the customer plants resumed operation. It was stated that the week begin-

ning November 29, 1970, presented the first opportunity for shipment to resume to twenty-three customer plants.

Witnesses for the union testified that they were told by other persons that there would be no delay regarding the recall to work once the strike ended. There was testimony for the union that as many customer plants were operating on December 3, 1970, as on November 16, 1970. The union also claimed that the extent of the start-up period was due not to the work stoppage but to a surplus of parts on hand.

We believe that there was substantial evidence to support the conclusions of the Board. The union knew in signing the Call Back Memorandum that operations would not necessarily resume simultaneously with the new collective bargaining agreement's effectuation, that employees would be recalled "as soon as the orderly start-up of operations permits, it being understood that the start-up of operations at some locations may be delayed by reason of continuing strike action by the Union at other locations." Following the standard set forth in *Bako,* we believe that the management exercised honest judgment. Considering the fact that the strike continued for almost two months and recognizing the relationship of the Pittsburgh plant and its customer plants, we hold that November 16 through December 2 was a reasonable start-up period, within the guideline established in *Bako,* and a direct result of the work stoppage. *See Chappelow Unemployment Compensation Case,* 176 Pa. Superior Ct. 162, 106 A. 2d 672 (1954).

Accordingly, we enter the following

### ORDER

Now, June 12, 1973, the claimants' appeals are dismissed and the orders of the Unemployment Compensation Board of Review are affirmed.