General Electric Company, Appellant *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Appellee.

Argued March 1, 1978, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., MENCER, ROGERS, BLATT and DISALLE.

*Francis J. Connell, III,* with him *John Markle, Jr., F. Freedley Hunsicker, Jr.,* and *Drinker, Biddle & Reath,* for appellant.

*Daniel R. Schuckers,* Assistant Attorney General, with him *Sydney Reuben,* Assistant Attorney General, and *Robert P. Kane,* Attorney General, for appellee.

OPINION BY JUDGE ROGERS, April 18, 1978:

General Electric Company has petitioned for review of decisions of the Unemployment Compensation Board of Review awarding unemployment compensation benefits to the claimants in two test cases involving 155 General Electric Company employees. The Board concluded that the claimants' unemployment was not due to a stoppage of work which existed because of a labor dispute, within the meaning of Section 402(d) of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(d).

Since, in accordance with the holding of *California Department of Human Resources Development v. Java*, 402 U.S. 121, 28 L.Ed. 2d 666 (1971), these claimants were paid unemployment compensation benefits immediately following the initial determination of their eligibility our decision will determine only whether General Electric's reserve account in the Unemployment Compensation Fund is charged with the monies paid to the claimants in these cases.

General Electric Company's Philadelphia facility houses a production process known as the Metal Enclosed Switchgear (M.E.S.) operation. This operation produces large electric switchgears and consists of the fabrication of steel to specification and the assembly of the switchgear, including wiring, testing, inspection, needed rewiring and shipping. The M.E.S. operation is an assembly or production line, the flow of which is as follows: The process begins in the fabrication shop where the steel is cut to the proper shape for switchgear doors and punched with holes for the instruments which will be later attached. After the doors are painted, they may go to one of several different shops, depending upon the customer's specifications. For example, an instrument door would remain in storage until the subassembly wiremen could

begin wiring and assembly work whereas a top plate would be sent to the top plate assembly where the top plate assemblers would perform the necessary assembly work. When the subassembly wiremen and the top plate assemblers have finished their work, the door is again stored until it can proceed to the final assembly unit where it is assembled into the finished product, tested, rewired if defects are found, inspected and shipped.

On March 15, 1972, approximately 80 wiremen and assemblers who comprised the top plate assembly and the final assembly units commenced a strike as the result of a labor dispute. The effect of this work stoppage, which continued until May 1, 1972, was the complete cessation of production in those two areas. When the strike began, the fabrication shop and subassembly workers, the so-called "upstream" workers who are the claimants in No. 1313 C.D. 1975, continued to work for about three weeks after the strike began but were then laid off by General Electric. The claimants in No. 1312 C.D. 1975 are the so-called "downstream" workers who perform the testing, inspecting and expediting functions in the M.E.S. operation. To a large extent, their duties are performed either during or after the final assembly unit has worked on the particular item. These claimants worked for several days after the commencement of the strike and were then laid off by the company. All of the claimants and the strikers were members of International Union of Electrical Workers Local 119.

The "upstream" and "downstream" workers applied individually for unemployment compensation benefits. The Bureau of Employment Security consolidated the cases into two representative groups: the Binder group which is comprised of the claimants who worked in upstream jobs, and the Saddic group made up of those claimants employed in downstream

jobs. The Bureau conducted a hearing after which it determined that the upstream claimants were entitled to receive benefits but that the downstream claimants were not. Both General Electric and the downstream claimants appealed from this determination and a second hearing was held before a referee on August 28, 1973. The referee affirmed the Bureau's determination as to the upstream claimants but reversed its determination as to the downstream claimants, thus holding that all of the claimants were eligible for benefits. General Electric appealed to the Unemployment Compensation Board of Review which affirmed the referee's decision, holding that the claimants' unemployment was not due to the strike and that therefore Section 402(d) would not apply to render them ineligible for compensation. General Electric asked us to review that decision.

Section 402(d) of the Unemployment Compensation Law, 43 P.S. §802(d) provides:

An employe shall be ineligible for compensation for any week—

. . . .

(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: Provided, that this subsection shall not apply if it is shown that (1) he is not participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed

at the premises at which the stoppage occurs, any of whom are participating in, or directly interested in, the dispute.

Since the claimants and the striking workers belonged to the same Local, we need not concern ourselves with the proviso to this section. We need only determine whether the Board erred in concluding that the claimants' unemployment was not due to the work stoppage which existed because of a labor dispute other than a lockout.

In its decision with respect to the upstream workers, that is, fabrication shop and subassembly employees, the Board made the following findings of fact:

8. The relationship of the various operations in the M.E.S. operation is such that all products must proceed through the Final Assembly Unit and many products must proceed through the Top Plate Assembly Area and from there they eventually proceed to the Final Assembly Unit.

9. From the Final Assembly Unit all products proceed to the Finish Paint Shop and then to the Shipping Department.

10. The claimants involved in this appeal were employed in the fabrication shop, in pre-assembly work, and in the storage rooms; claimant Binder was employed as a punch press operator in the fabrication shop.

11. The work done in the fabrication shop, in pre-assembly work and in the storage rooms proceeds eventually to the Final Assembly Unit.

12. After the commencement of the work stoppage involving the wiremen and the assemblers, claimant Binder continued to work.

13. Due to the work stoppage by those in the Top Plate Assembly Area and Final Assembly

Unit, work which proceeded from the other areas and units could not be economically and efficiently processed; a production imbalance resulted.

14. The fabrication shop employees continued to work until the employer determined that from an inventory cost standpoint it was not economically feasible to continue work in the fabrication shop; claimant Binder was laid off on April 14, 1972 because of the economic decision of the employer to lay the claimant off.

15. Continuing work was available to the claimant in the fabrication shop if the employer had not made the economic decision to lay the claimant off.

With respect to the downstream workers performing tests, inspecting and expediting functions, the Board made the following findings:

7. The claimants and the wiremen and assemblers work in the metal enclosed switchgear (M.E.S.) operation of the employer.

8. The relationship of the various operations in the M.E.S. operation is such that all products must proceed through the Final Assembly Unit and many products must proceed through the Top Plate Assembly Area and from there they eventually proceed to the Final Assembly Unit.

9. From the Final Assembly Unit all products proceed to the Finish Paint Shop and then to the Shipping Department.

10. The claimants involved in this appeal were employed as testers, quality control workers and expeditors; claimant Saddic was employed

as a tester working throughout the M.E.S. operation.

11. The work done by the testers and the work done throughout M.E.S. operation proceeds eventually to the Final Assembly Unit.

12. After the commencement of the work stoppage involving the wiremen and the assemblers, claimant Saddic continued to work.

13. Due to the work stoppage by those in the Top Plate Assembly Area and Final Assembly Unit, work which proceeded from the other areas and units could not be economically and efficiently processed; a production imbalance resulted.

14. Claimant Saddic continued to work until the employer determined that from an inventory cost standpoint it was not economically feasible to continue employing the testers; claimant Saddic was laid off on March 21, 1972 because of the economic decision of the employer.

15. Continuing work was available to the claimant if the employer had not made the economic decision to lay the claimant off.

16. Some of the testers including the claimant, were recalled to work during the work stoppage.

It is clear that these findings of fact are supported by substantial evidence in the record—with the notable exceptions of finding No. 15 made in the upstream workers case, and findings No. 15 and No. 16 made in the case of the downstream workers. Insofar as these three exceptional findings imply that the M.E.S. production line continued to operate after the strike and that its continued operation made work available,

either upstream or downstream, they have no support whatsoever in the record; and indeed all of the evidence is to the effect that the M.E.S. line was not operable during the strike. While it is true that a company representative testified that the upstream workers could have continued to turn out switchgear doors after the strike, the undisputed evidence is that there was no place downstream for those doors to go, that the doors piled up at the point of their completion to the extent that the employer had no place safely to store them and that for these reasons the employer reached what the Board calls an economic decision to effect the layoff of other workers on the line. Indeed, the Board's finding No. 14 in the upstream case is that the upstream workers continued to work until "from an inventory cost standpoint, it was not economically feasible to continue work in the fabrication shop."

Findings No. 15 and No. 16 in the downstream workers' case that continuing work was available to the downstream workers and that some of them, testers, were recalled to work during the work stoppage, if read as suggesting that there was M.E.S. production line work for these workers, are also without support on the record. There is indeed evidence that some of the testers *who had been laid off because of the work stoppage* were for awhile called back to work during the strike. It is clear as crystal, however, that this work was not in the M.E.S. operation.

The findings of the Board which *are* supported by the evidence show that the M.E.S. was a continuous integrated production line and that the strike made the continued operation of any part of the line infeasible. These findings and the cases of *Unemployment Compensation Board of Review v. National Valve & Manufacturing Co.,* 19 Pa. Commonwealth Ct. 565, 339 A.2d 137 (1975) ; *Rusynko Unemployment*

*Compensation Case,* 191 Pa. Superior Ct. 434, 156 A. 2d 576 (1959); and *Oliver Unemployment Compensation Case,* 189 Pa. Superior Ct. 362, 150 A.2d 361 (1959), holding that nonstriking workers on a continuous integrated production line laid off when the line is shut down by a strike of other workers on the line are ineligible for compensation, would seem inexorably to lead to the conclusion that the claimants in this case were also ineligible. The Board's reason for its contrary decision here seems to lie in its assertion that the employer effected these layoffs for economic reasons. In its opinions in both the upstream and downstream cases, the Board notes that "the employer's initial response as to the reason for the claimant's separation was 'lack of work (material shortages—no orders, etc.).'" What the Board does not mention, however, is that this response was made by checking a box on a printed form sent to the employer. The only other choice provided by the form was that of "other." Since the reason for the claimants' unemployment was in fact a lack of work on the production line, the employer's choice of answer was not inappropriate. We emphasize that the parenthetical phrase "(material shortages—no orders, etc.)" appeared on the printed form after the phrase "lack of work" presumably as instances of lack of work. The phrase "production line down due to strike" might have as appropriately appeared at this place. The Board's reliance on this response is misplaced, if not disingenuous, in view of the fact that there is no evidence whatsoever in this considerable record of "material shortages [or] no orders."

A second reason advanced by the Board as supporting its conclusion that the downstream workers were laid off for reasons other than the strike was that "some of the testers, including the claimant, were recalled to work during the work stoppage." As we

have already noted, the testers who were recalled were sent to work in another plant where other tests were made.

Finally, the Board notes the testimony of witnesses that there was work available at the employer's facility where these claimants were laid off. The question in this case, however, is not whether there is work available anywhere in the employer's operation, but solely whether the claimants' unemployment was due to the work stoppage created by the strike. In *Unemployment Compensation Board of Review v. Tickle*, 19 Pa. Commonwealth Ct. 550, 560, 339 A.2d 864, 869 (1975), we specifically held "that the phrase, 'stoppage of work which exists because of a labor dispute,' as used in Section 402 of the Act, means any cessation of work by an employe due to a labor dispute, irrespective of whether or not continuing work is available."

The principle that the fact that an employer's decision to lay off or call back employees as the result of a work stoppage caused by a strike is economic will not render the employees eligible for unemployment benefits is illustrated by the *General Motors Corporation Unemployment Compensation Cases*, 9 Pa. Commonwealth Ct. 221, 306 A.2d 399 (1973). There, the claimants were employed in General Motors' West Mifflin stamping plant where subassembled component parts of automobile bodies were produced for shipment to other assembly plants. Following settlement of a nationwide strike against General Motors, the claimants were not immediately recalled because the assembly plants to which the West Mifflin plant's products were shipped were still on strike. The employer's reason for not immediately recalling the claimants was that in the absence of a place to send the fabricated parts, the plant would be simply building unneeded inventory. We held that General Mo-

tors' economic decision not to recall the claimants, strikingly similar to the one made here by General Electric, was due to the work stoppage and that the claimants were not eligible for compensation. We hold here that General Electric's economic decision to lay the claimants off because it was not economically feasible to have the upstream claimants building inventory for which there was no safe storage space or to have the downstream claimants perform other work for which there was no need, was the result of the work stoppage existing because of a labor dispute.

It is well settled in unemployment compensation cases that a reasonable business decision to lay off employees made in good faith by the employer in the context of a labor dispute does not qualify those employees for unemployment compensation benefits. Since there is no evidence of bad faith in General Electric's actions in laying off these claimants, we hold that Section 402(d) is applicable to render these claimants ineligible for compensation.

ORDER

AND Now, this 18th day of April, 1978, the orders of the Unemployment Compensation Board of Review in Nos. 1312 C.D. 1975 and 1313 C.D. 1975 are hereby reversed.

Judge DiSALLE dissents.