WILLIAM ABILLA, individually and as a representative of the claimants who were employed by Pacific Concrete and Rock Company, Ltd., and AMADO P. AGRISOLA, individually and as a representative of the claimants who were employed by Lone Star Hawaii Rock Products, Inc., Appellants-Appellants, *v.* JOSHUA C. AGSALUD, Director of the Department of Labor and Industrial Relations, State of Hawaii; PACIFIC CONCRETE AND ROCK COMPANY, LTD., and LONE STAR HAWAII ROCK PRODUCTS, INC., Appellees-Appellees (Civ. No. 85-4358)

CHARLES GOODNUE, JR. and ROBERT PALEKA, Appellants-Appellants *v.* JOSHUA C. AGSALUD, Director of the Department of Labor and Industrial Relations, State of Hawaii; and PACIFIC CONCRETE AND ROCK COMPANY, LTD., Appellees-Appellees (Civ. No. 86-0846)

NO. 11699

AUGUST 31, 1987

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

An unemployment compensation claimant is disqualified from receiving benefits "[f]or any week with respect to which it is found that [his] unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which [he] is or was last employed."[1] The question in this appeal from the Circuit Court of the First Circuit is whether a

---

[1] The Hawaii Employment Security Law provides in part that:

An individual shall be disqualified for benefits:

. . . . .

(4) Labor dispute. For any week with respect to which it is found that the individual's unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which the individual is or was last employed; provided that this paragraph shall not apply if it is shown that:

(A) The individual is not participating in or directly interested in the labor dispute which caused the stoppage of work; and

stoppage of work brought on by an employer's decision to "lock out" its employees disqualifies them from receiving benefits. The circuit court agreed with the Department of Labor and Industrial Relations (DLIR or the department) that the "labor dispute" disqualification applied, and so do we.

## I.

The claimants-appellants are ninety-six employees of Pacific Concrete and Rock Company, Ltd. and seventy-one employees of Lone Star of Hawaii Rock Products, Inc. who are represented by the Cement Quarry Workers, Ready Mix and Dump Truck Drivers, Local 681, an affiliate of the International Brotherhood of Teamsters, for purposes of collective bargaining. Prior to 1984, Pacific Concrete, Lone Star, and Ameron HC&D, the major suppliers of concrete on Oahu, bargained separately with Local 681 to set wages, hours, and other terms and conditions of employment for their employees. But in 1983 the three employers formed the Concrete Industry Bargaining Association of Hawaii (CIBA) to facilitate collective bargaining on a multi-employer basis in 1984, when their agreements with Local 681 were due to expire. They designated CIBA as their bargaining representative and signed a mutual assistance pact, agreeing, *inter alia,* that "[i]f [the] union takes strike action against any member, all members . . . will close down and lock out their employees as a defensive measure to such tactics . . . ." The union was apprised on April 18, 1984 of the employers' pact to bargain together and their resolve to counter a strike against one company with a lockout of the employees of the other companies.

---

(B) The individual does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or directly interested in the dispute; provided that if in any case separate branches of work, which are commonly conducted as separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall, for the purpose of this paragraph, be deemed to be a separate factory, establishment or other premises.

Hawaii Revised Statutes (HRS) § 383-30(4) (1985).

Local 681, however, resisted the employers' demand for multi-employer bargaining. Although a number of meetings between representatives of the union and the CIBA bargaining committee, composed of representatives of the three concrete companies and another person versed in collective bargaining who acted as their spokesman, were held before the expiration of the old agreements on July 15, 1984, the union insisted on designating the meetings as either Pacific Concrete or Ameron negotiating sessions. No bargaining for a new agreement covering Lone Star's employees occurred until CIBA filed a refusal to bargain charge with the National Labor Relations Board (NLRB).

The parties stepped up negotiations as the crucial date of July 15, 1984 approached but could not reach accord. The negotiating sessions, however, were still designated by the union as either Pacific Concrete or Ameron sessions. Yet even as the deadline drew nigh, neither side declared that the parties were at an impasse. They attempted instead to negotiate an extension of the old agreement but could not agree on this too.

Though the collective bargaining agreements expired on July 15th, the employees of the three companies reported for work on July 16th. On the following day, the employees of Pacific Concrete and Lone Star reported for work; the employees of Ameron did not — Local 681 informed Ameron that they were at a "stop-work meeting."[2] The union did not deem their absence from work a strike since the membership had not yet authorized strike action. The employer response was a communication informing the employees of Pacific Concrete and Lone Star that a defensive lockout was being imposed and no work was being offered as of July 18, 1984 because of the union's decision to "selectively shut down a single member of this group (CIBA)." The strike and the lockout continued for approximately three months.

The locked-out employees filed claims for weekly unemployment benefits during the lockout. The Unemployment Insurance Division of the Department of Labor and Industrial Relations ruled the claimants "were disqualified from receiving benefits because their unemployment was due to a labor dispute." The claimants

---

[2] In the parlance of labor-management relations, a "stop-work meeting" is a union meeting conducted during what would otherwise be working hours.

appealed the ruling to the Referee for Unemployment Compensation Appeals, arguing "they were actually locked out by their employers, not because of a labor dispute but because of the provision in the CIBA agreement which mandated that '[i]f a union takes strike action against any member, all members of CIBA-HAWAII will close down and lock out their employees as a defensive measure to such tactics . . . .' "

The referee found this untenable. In his view "it [was] clear that the lockout would not have occurred but for the dispute between claimants and their employers regarding terms and conditions of employment." And since Pacific Concrete and Lone Star received "scarcely any revenue" during the lockout, he found there was a stoppage of work at the establishments where the claimants were last employed. Thus, he concluded "the claimants . . . were, in fact, involved in a labor dispute as defined in Administrative Rule § 12-5-63, and, therefore, [fell] under the disqualifying provision of [HRS §] 383-30(4) . . . ."

The claimants continued to press their claims for benefits by seeking judicial review of the unfavorable administrative ruling. The circuit court affirmed the referee's decision, and the claimants now seek final review of the ruling that an individual is disqualified for benefits when the stoppage of work at the establishment where he was last employed is the result of an employer decision to temporarily cease operations "to bring pressure upon [a] union to modify its demands." *American Ship Building Co. v. NLRB,* 380 U.S. 300, 312 (1965).[3]

---

[3] The difference and similarity between a "strike" and a "lockout" were succinctly delineated by Judge Grosscup in these terms:

A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lock out is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms. Neither strike nor lock out completely terminates, when this is its purpose, the relationship between the parties. The employees who remain to take part in the strike or weather the lock out do so that they may be ready to go to work again on terms to which they shall agree — the employer remaining ready to take them back on terms to which he shall agree.

*Iron Molders' Union No. 125 v. Allis-Chalmers Co.,* 166 F. 45, 52 (7th Cir. 1908) (Grosscup, J., concurring).

## II.

We begin our review by re-examining the language of the "labor dispute" disqualification and the judicial gloss it acquired a quarter of a century ago.

### A.

The provision barring an individual from receiving benefits "[f]or any week with respect to which it is found that [his] unemployment is due to a stoppage of work which exists because of a labor dispute at the . . . establishment . . . at which [he] is or was last employed"[4] has been part of the Hawaii Employment Security Law since 1941. *See* S.L.H. 1941 c 304, § 1. In enacting a "labor dispute" disqualification Hawaii, like the vast majority of the states doing so, followed a draft bill furnished by the Social Security Board. *See* Williams, *The Labor Dispute Disqualification – A Primer and Some Problems,* 8 Vand. L. Rev. 338, 338-39 (1955); Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification,* 17 U. Chi. L. Rev. 294, 294-95 (1950).[5] By the time we were called upon to expound the provision in 1962, questions surrounding its application had been explored in depth by more than several courts and commentators. "The various ramifications [of the language borrowed from the federal draft] ha[d] been evaluated in inquiring and thorough detail." Williams, *supra,* at 338 (footnote omitted). And, "with regard to most of the questions arising [thereunder], generally accepted answers [had emerged] — answers which [did] not vary across jurisdictional lines." *Id.*

---

[4] *See supra* note 1.

[5] The pertinent provision in the most widely adopted draft bill read as follows:

An individual shall be disqualified for benefits — (d) For any week with respect to which the commissioner finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed[.]

Williams, *supra,* at 339.

B.

We first studied the language of the disqualification and its ramifications in a case arising from "a dispute over employee representation by a union [that culminated] in an organizational strike." *Inter-Island Resorts, Ltd. v. Akahane,* 46 Haw. 140, 146, 377 P.2d 715, 719 (1962). The claimants there, who were then employees of a hotel in Kailua, Kona, struck their employer on December 31, 1952. Services were curtailed, but the employer managed to keep the hotel open. "During the first week of the strike the employer hired replacements and by the end of the week operations and service were substantially back to normal." *Id.* at 142, 377 P.2d at 717. The union representing the employees was informed about a month later that some positions were still vacant and available, but no striker accepted the offer of reemployment.

Thirty-two striking employees filed claims for unemployment benefits beginning with the week of February 1, 1953. Finding no "stoppage of work" existed, the department, then denominated the Commission of Labor and Industrial Relations of the Territory of Hawaii, allowed the claims. The departmental determination was appealed, and a referee of the Bureau of Employment Security affirmed the initial determination of compensability. The employer sought judicial review of the referee's ruling, and the Circuit Court of the Third Circuit held the claimants were "disqualified for unemployment compensation under Section 4231(d), Revised Laws of Hawaii 1945."[6]

The Commission appealed to this court. We began our analysis of the several issues posed on appeal by noting the parties apparently agreed "the cause of the unemployment of the claimants was the dispute over employer representation . . . ." *Id.* at 145, 377 P.2d at 719. There was disagreement, however, on "whether or not such dispute constituted a 'labor dispute' as that term is used in the Hawaii Employment Security Law." *Id.*

We observed that the term "is nowhere defined in the . . . [l]aw." *Id.* Since most of the states had also followed the draft bill Hawaii had in enacting their unemployment compensation acts,

---

[6] Revised Laws of Hawaii (RLH) 1945 § 4231(d) is now HRS § 383-30(4). The pertinent language, however, has not been amended.

the law in most jurisdictions "likewise fail[ed] to define [the] term." *Id.* "For the most part courts . . . ha[d] resorted to the definition given in the National Labor Relations Act and the Norris-La Guardia Act."[7] *Id.* (citations omitted). "In fact some courts ha[d] gone so far as to hold the federal statutory definitions binding." *Id.* We found it unnecessary to go this far, for the "definition contained in the National Labor Relations Act ha[d] been substantially incorporated in Chapter 92, Revised Laws of Hawaii 1955, dealing with Labor Disputes, Stevedoring Industry." *Id.* at 146, 377 P.2d at 719.[8] In light of "this legislative expression of approval," we applied the term expansively to "embrace[] the concept of a dispute over employee representation by a union resulting in an organizational strike." *Id.*

We next scrutinized "stoppage of work" to see whether it "refer-[red] to the curtailment of [the] employer's business [or] to the cessation of the individual employee's labor." *Id.* Since the term "ha[d] been used in the labor dispute disqualification provisions of many of the state unemployment insurance laws[,]" we were not at a loss for guidance. *Id.* at 146-47, 377 P.2d at 719 (footnote omitted). "The leading case construing the term 'stoppage of work'

---

[7]The footnote at this point of the opinion in *Inter-Island Resorts, Ltd. v. Akahane* reads as follows:

The definition in the National Labor Relations Act, Title 29, § 152(9), U.S.C.A., reads:

"The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

46 Haw. at 145 n.3, 377 P.2d at 719 n.3.

[8] The note at this point reads:

"§ 92-2. *Definitions.* As used in this chapter unless the context clearly indicates otherwise:
 * * * * * * * *

"(f) 'Industrial dispute' and 'labor dispute' mean any controversy concerning wages, hours or other terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange wages, hours or other terms or conditions of employment."

46 Haw. at 146 n.4, 377 P.2d at 719 n.4.

[was] *Lawrence Baking Co. v. Michigan Unemployment Comp. Comm'n,* 308 Mich. 198, 13 N.W.2d 260." 46 Haw. at 147, 377 P.2d at 720. We accepted its holding that the term "refer[red] to the work and operations of the employer establishment and not to the work of the individual employee." 308 Mich. at 209, 13 N.W.2d at 264. If "stoppage of work" were read "as cessation of work by the individual employee [the term would then have been] synonymous with unemployment [and] meaningless[, since] the language of [the disqualification provision] expressly presupposes the existence of unemployment. See, Williams, *The Labor Dispute Disqualification,* 8 Vanderbilt Law Review 338; *Sakrison v. Pierce,* 66 Ariz. 162, 185 P.2d 528." 46 Haw. at 148, 377 P.2d at 720.[9] Thus, we concluded a "substantial curtailment [of business activities] at the employer's establishment" constituted a "stoppage of work" that would disqualify a claimant. *Id.* at 150, 377 P.2d at 721.

After addressing questions relating to the claimants' availability for work during the strike, a matter not in issue here, we proceeded to the contention of Inter-Island Resorts "that each claimant in going out on a strike . . . , voluntarily left his work without good cause attributable to his employing unit and [was] therefore disqualified for unemployment benefits under the provisions of [RLH 1945 § 4231(a)]." *Id.* at 156, 377 P.2d at 724.[10] We rejected the

---

[9] HRS § 383-1(16) (1985) in pertinent part reads:

An individual shall be deemed "unemployed" in any week during which the individual performs no services and with respect to which no wages are payable to the individual, or in any week of less than full time work if the wages payable to the individual with respect to such week are less than the individual's weekly benefit amount.

An "unemployed" individual is only eligible for benefits if the department finds that he has met the requirements delineated and described in HRS § 383-29.

Thus, a ruling that a claimant is disqualified under any provision of HRS § 383-30 indicates the department has found that he is "unemployed" and would have received benefits but for his disqualification.

[10] RLH 1945 § 4231(a) read as follows:

An individual shall be disqualified for benefits:

(a) *Voluntary separation.* For any week in which he has left his work voluntarily without good cause attributable to his employing unit and for not less than two or more than seven consecutive weeks of unemployment which immediately follow such week, as determined according to the circumstances in each case.

The subsection is now HRS § 383-30(1).

argument because it was "in direct conflict with the generally accepted interpretation of the voluntary leaving and the labor dispute disqualification provisions of the various state laws." *Id.* (footnote omitted). "The consensus support[ed instead] the conclusion that the two disqualification provisions [were] mutually exclusive and that an individual whose unemployment [was] due to a 'stoppage of work' which exists because of a 'labor dispute' [could not] be said to have 'left his work voluntarily' within the meaning of the voluntary separation provision." *Id.* (citations omitted).

A "fundamental tenet[] of the unemployment compensation law [is] that the administering agency [should] remain neutral in the labor dispute and refrain from passing on the merits of the dispute." *Id.* at 156-57, 377 P.2d at 724. "[T]he application of the voluntary separation disqualification to a striker," we were convinced, "would violate the neutrality doctrine inasmuch as it would necessitate determining the justification of the strike in order to decide whether the claimant left his work 'without good cause . . . .' " *Id.* at 157, 377 P.2d at 724. To apply the voluntary-leaving disqualification in a labor-dispute context, we feared, "might . . . require the . . . agency and the courts to determine both the justice of the parties' cause and the reasonableness of the strike or lockout as a means of enforcing their demands." *Id.* at 157, 377 P.2d at 725 (quoting Lesser, *Labor Dispute and Unemployment Compensation,* 55 Yale L.J. 167, 178 (1945)). Moreover, our concurrence with Inter-Island that each claimant was subject to disqualification for leaving work voluntarily would have served "to automatically disqualify all strikers from unemployment benefits" and render "stoppage of work" superfluous. 46 Haw. at 160, 377 P.2d at 726.[11] We, therefore, found no reason to deny benefits and reversed the circuit court.

---

[11] Inter-Island's contention that the striking employees were disqualified under RLH 1945 § 4231(c) because of their refusal to return to work after being informed that certain positions remained vacant and available to them was rejected for the same reasons.

RLH 1945 § 4231(c) (now HRS § 383-30(3)) in relevant part read:

An individual shall be disqualified for benefits:

(c) *Failure to apply for work, etc.* If he has failed, without good cause, either to apply for available, suitable work when so directed by the employment

C.

Our subsequent decisions where the labor dispute disqualification has been implicated have reiterated the holdings in *Inter-Island Resorts, Ltd. v. Akahane. See International Brotherhood of Electrical Workers, Local 1357 v. Hawaiian Telephone Co.*, 68 Haw. ____, ____, 713 P.2d 943, 952-53 (1986); *Ahnne v. Department of Labor and Industrial Relations*, 53 Haw. 185, 189, 489 P.2d 1397, 1400 (1971); *Meadow Gold Dairies-Hawaii, Ltd. v. Wiig*, 50 Haw. 225, 227-28, 437 P.2d 317, 319 (1968). In every case we read "stoppage of work" to mean a "substantial curtailment of the business activities at the employer's establishment rather than unemployment on the part of the striking employee." *Ahnne v. Department of Labor and Industrial Relations*, 53 Haw. at 189, 489 P.2d at 1400. And the allowance of benefits in each was affirmed on the basis of a showing that there was no substantial curtailment of business activities at the relevant employer establishment, though the striking employees left work of their own accord.

---

office or the board or any duly authorized representative of the board, or to accept suitable work when offered him.

We concluded that "[w]here claimants are unemployed because of a labor dispute, and the employment relationship remains unsevered by any intervening cause, the existence of a 'stoppage of work' perforce excludes the application of the refusal to accept suitable work disqualification." 46 Haw. at 161, 377 P.2d at 726 (citation omitted). We further concluded that if the employment relationship is terminated after the commencement of the strike, "then the proviso in Section 4231(c)(2)(A) [now HRS § 383-30(3)(B)(i), *see infra* note 13,] prohibit[ed] the denial of benefits for refusal to accept the work." *Id.*

We reasoned too that:

The socalled suitable work offered here was by the employer whose men, including the claimants, had suspended work because of a labor dispute. This could hardly be called suitable work, inasmuch as to return to it the strikers would have to abide by the employer's terms and conditions for re-employment without having settled their labor dispute as to union representation. To require a striker to return to work in a "struck" establishment, under pain of disqualification from unemployment compensation benefits, would effectively emasculate a "strike" as an effective economic weapon in the field of labor-management relations. It would do violence to the principle of neutrality required of the commission. Further, it certainly is contrary to the definition of "suitable work" as set forth in Section 4231(c)(2)(A) which provides that no work shall be deemed suitable "if the position offered is vacant due directly to a strike, lockout, or other labor dispute."

*Id.* at 161-62, 377 P.2d at 726-27.

### III.

Claimants-appellants concede there were "stoppages of work" at the Pacific Concrete and Lone Star plants but maintain the stoppages were not disqualifying because "labor dispute" does not encompass a "lockout." They urge the adoption of a "volitional" or an "impasse" test to determine disqualification or not in a lockout situation. We conclude, however, that "labor dispute" covers "any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment," *Inter-Island Resorts, Ltd. v. Akahane,* 46 Haw. at 145 n.3, 377 P.2d at 719 n.3; and resort to the suggested tests would breach a basic principle that agencies administering the unemployment compensation law and courts reviewing their rulings should "remain neutral in the labor dispute and refrain from passing on [its] merits." *Id.* at 157, 377 P.2d at 724.

### A.

Claimants-appellants open their argument with the proposition that our statutes and appellate decisions "are silent as to whether a lockout is a labor dispute." Of course, this belief is unfounded. The absence of an express provision that a "lockout" is a "labor dispute" within the meaning of the unemployment compensation law can hardly be equated with silence. For the legislature has spoken clearly and unmistakably on the matter in other labor laws and in the very section of the Hawaii Employment Security Law at issue, HRS § 383-30.

Our opinion in *Inter-Island Resorts, Ltd. v. Akahane,* reflected a perception of a "legislative expression of approval" in another labor law of an expansive reading of "labor dispute" for purposes of applying the labor dispute disqualification. 46 Haw. at 146, 377 P.2d at 719. Noting that the law purporting to regulate labor disputes in the stevedoring industry defined the term to mean "any controversy concerning wages, hours or other terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to

arrange wages, hours or other terms or conditions of employment," *id.* at 146 n.4, 377 P.2d at 719 n.4, we accepted the definition "as governing the situation before us which [was] a dispute over employee representation." *Id.* at 146, 377 P.2d at 719. We could have mentioned too that the same statute defined "lockout" to mean "the refusal of an employer to furnish work to employees as the result of a labor dispute between [the] employer and its employees." RLH 1955 § 92-2(h) (now HRS § 382-1).

Four other statutes compiled under Title 21 of the Hawaii Revised Statutes, Labor and Industrial Relations, define "labor dispute" in the same or essentially the same language. HRS chapter 381, which purports to regulate disputes between public utilities and their employees, contains the same definitions of "labor dispute" and "lockout" that are employed in HRS chapter 382. *See* HRS § 381-1. HRS chapter 377, the State counterpart of the National Labor Relations Act, HRS chapter 380, Hawaii's Little Norris-La Guardia Act, and HRS chapter 379, dealing with the recruiting and hiring of employees during labor disputes, all define "labor dispute" in language essentially repeating the definition in HRS chapter 382.[12]

Even if we were able to overlook the declarations elsewhere that "labor dispute" includes any controversy between an employer and its employees or their representative in bargaining over wages, hours, or other terms and conditions of employment, we could hardly ignore the legislative recognition in the Hawaii Employment Security Law itself that the term encompasses a lockout. For HRS

---

[12] HRS § 377-1(8) (1985) reads:
"Labor dispute" includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.

HRS § 380-13(3) (1985) reads:

The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

The pertinent term in HRS § 379-1 (1985) is "labor disputes" and the definition, like that in HRS § 377-1(8), includes "tenure" of employment.

§ 383-30(3)(B)(i) speaks of "a *strike, lockout, or other labor dispute*" in the same breath and leaves no room for conjecture on whether "labor dispute" when used in HRS chapter 383 describes a lockout or not.[13] (Emphasis added).

### B.

Claimants-appellants then urge that we follow a few other jurisdictions and employ a "volitional" test to determine benefit entitlement in the circumstances. "The volitional test," they acknowledge, would call for "a determination . . . as to whether the Appellants were involuntarily unemployed through no fault of their own." Averring an absence of fault on their part, claimants-appellants maintain the denial of benefits was error. Alternatively, they argue benefits should have been paid because no "impasse" in bargaining had been reached and they "were willing to continue to work." But we have eschewed the use of a voluntary-involuntary unemployment test to determine disqualification in a labor dispute context.

In *Inter-Island Resorts, Ltd. v. Akahane*, we concluded "the application of the voluntary separation disqualification to a striker . . . would violate the neutrality doctrine [since] it would necessitate determining the justification of the strike in order to decide whether [he] left his work 'without good cause . . . .' " 46 Haw. at 157, 377 P.2d at 724. If the receipt of unemployment benefits during a lockout turned on whether or not claimants "were involuntarily unemployed through no fault of their own," the administering agency and the courts would be called upon "to determine both the justice of the [employer's] cause and the reasonableness of the . . . lockout as a means of enforcing [its] demands." *Id.* at

---

[13] HRS § 383-30(3)(B) (1985) reads in part:

 (B) Notwithstanding any other provisions of this chapter, no work shall be deemed suitable and benefits shall not be denied under this chapter to any otherwise eligible individual for refusing to accept new work under any of the following conditions:

 (i) If the position offered is vacant due directly to a strike, lockout, or other labor dispute[.]

157, 377 P.2d at 725 (quoting Lesser, *supra,* at 178).[14] This would be true too if the agency or the courts were required to decide whether an "impasse" had been reached before the lockout; they would again be violating the doctrine of neutrality and be intruding as well in an area reserved for the NLRB.

Since there is no question about the substantial curtailment of business activities at the establishments where claimants-appellants were employed and we have concluded that "labor dispute" embraces a lockout, we affirm the judgment of the circuit court.

*Colleen H. Sakurai (James E. T. Koshiba* with her on the briefs; *Koshiba & Young,* of counsel) for appellants.

*Richard M. Rand (Torkildson, Katz, Jossem, Fonseca & Moore,* of counsel) for Appellees Pacific Concrete & Lone Star.

*Wilfredo Tungol,* Deputy Attorney General, for Appellee Director of Labor.

---

[14] The NLRB has sanctioned the use of a lockout in given situations. *See American Ship Bldg. Co. v. NLRB,* 380 U.S. 300, 307 (1965). For example, "the Board has sanctioned the use of the lockout by a multiemployer bargaining unit as a response to a whipsaw strike against one of its members." *Id.* (citations omitted). The Supreme Court has also agreed with the Board that "a temporary lockout to preserve the multi-employer bargaining basis from the disintegration threatened by the Union's strike action was lawful." *NLRB v. Truck Drivers Local Union No. 449,* 353 U.S. 87, 97 (1957). And the Court has held that an employer does not violate the National Labor Relations Act "when, after a bargaining impasse has been reached, he temporarily shuts down his plant and lays off his employees for the sole purpose of bringing economic pressure to bear in support of his legitimate bargaining position." *American Ship Bldg. Co. v. NLRB,* 380 U.S. at 318.