132 P.3d 368

HAWAII TEAMSTERS AND ALLIED WORKERS, LOCAL 996 on behalf of the Affected OTS Employees Shown on Exhibit "B" Attached Hereto, Claimant–Appellant

v.

DEPARTMENT OF LABOR AND IN-DUSTRIAL RELATIONS, State of Hawai'i, Appellee–Appellee

and

Oahu Transit Services, Inc., Employer–Appellee.

No. 27301.

Supreme Court of Hawai'i.

April 18, 2006.

Sean Kim, on the briefs, Honolulu, for claimant-appellant.

Frances E.H. Lum and Li–Ann Yamashiro, Deputy Attorneys General, on the briefs, for appellee-appellee.

Gregory M. Sato and Paul M. Saito (Torkildson, Katz, Fonseca, Moore & Hetherington), on the briefs, Honolulu, for employer-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

In this secondary appeal, Claimant–Appellant Hawaii Teamsters and Allied Workers, Local 996 (Local 996) appeals from the April 21, 2005 final judgment of the circuit court of the first circuit[1] (the court) in favor of Appellee–Appellee State of Hawaiʻi, Director of Labor and Industrial Relations (DLIR) and Employer–Appellee Oahu Transit Services, Inc. (OTS) and against Local 996. Local 996 also challenged the court's April 21, 2005 order affirming Decision 0303317 of the Employment Security Appeals Referees' Office dated April 8, 2004, disqualifying Local 996 from receiving unemployment compensation benefits. We affirm the April 21, 2005 final judgment.

I.

On May 1, 1991, ordinance 91–27 was adopted, amending Chapter 28 of the Revised Ordinances of Honolulu (ROH) by adding three new articles, including article 1C. It authorized the Department of Transportation Services of the City and County of Honolulu (DTS), also known as "the public transit authority," to contract with a private non-profit corporation to "manage, operate, and maintain the city bus system [ (the bus) ] on behalf of the city." ROH § 28–1C.1(a) provided:

> Subject to council appropriations, *the public transit authority shall have the ex-*

---

**1.** The Honorable Eden Elizabeth Hifo presided.

clusive power to establish the routes, schedules, and levels of service of the City bus system. The routes, schedules, and levels of service establish by the authority shall be in conformance with the short-range transit plan and any update. Neither the council nor mayor shall have the power to directly modify, add to, retract, or otherwise revise the routes, schedules, and levels of service.

(Emphasis added.) ROH § 28–1C.2 provided in pertinent part:

(a) ... Under the contract [for Management, Operation, and Maintenance of City Bus System], the private, nonprofit corporation:

(1) Shall be an independent contractor with the City;

(2) Shall be the employer of record of personnel of the City bus system, who shall not be deemed public employees under chapter 89, Hawaii Revised Statutes;

. . . .

(4) Shall manage, operate, and maintain the City bus system in the most efficient and effective manner and in accordance with sound management practices; and

(5) Shall have no purpose, except the management, operation, and maintenance of the City bus system as an instrumentality of the City.

(Emphases added.) ROH § 28–1C.4 refers to the Obligations and Responsibilities of DTS and states in relevant part:

(a) Under the bus management service contract, the bus management services contractor at a minimum shall have the following general obligations and responsibilities:

. . . .

(10) Operate the City bus system in accordance with routes, schedules, and levels of service established by the public transit authority pursuant to section 28–1C.1[.]

On February 25, 1997, the DTS entered into a management agreement with the OTS[2] pursuant to Ordinance 91–27. The agreement states in pertinent part:

WHEREAS, pursuant to Ordinance No 91–27, the HPTA and OTS entered into an Agreement on January 1, 1992 under which OTS will manage, operate, and maintain the City bus system (also known as "The Bus") on behalf of the city; and

. . . .

WHEREAS, Ordinance 96–30 requires OTS to assume the operation and management of both The Bus and the City special transit service on April 1, 1997 ...

. . . .

NOW THEREFORE, for an in consideration of the mutual promises and covenants contained herein, it is agreed that:

SECTION I—SCOPE OF SERVICES—
CITY BUS SYSTEM

1.1 For and in consideration of the compensation hereinafter specified, OTS agrees to furnish management services reasonable and necessary for the safe and efficient day-to-day operation of the City bus system ..., including those duties and responsibilities set forth in Ordinance 96–30....

1.2 OTS shall manage, operate and maintain the City bus system, which shall include but not be limited to the following: ..., and all other services ordinarily required in the daily operation of a transit system.

1.3 It is expressly agreed by the parties hereto that neither OTS nor any of its employees are employees of the City for any purposes whatsoever, but are independent contractors. Nothing contained herein shall be construed to create a partnership or joint venture between the parties.

. . . .

---

**2.** The Articles of Incorporation of Oahu Transit System in Section 3.1 states that "[t]he purpose of the corporation shall be to manage, operate and maintain the City and county of Honolulu bus system, special transit service and other transit related services on behalf of and for the city and county of Honolulu."

*SECTION II—SCOPE OF SERVICES—CITY SPECIAL TRANSIT SERVICE*

2.1 *OTS shall manage, operate, and maintain the City special transit service in accordance with prudent management and accepted industry standards and practices.* These shall *include but not be limited to the following:* ..., and *all other services ordinarily required in the daily operation of a special transit system.*

. . . .

*SECTION V—ESTABLISHMENT OF POLICY*

5.1 The City shall have charge of all policy matters relating to the City bus system and the City special transit system, including the establishing of fares and other charges, standards of service, route locations, capital improvements, annual budgets and service improvements. . . .

. . . .

*SECTION VII—EMPLOYER STATUS*

. . . .

7.2 *OTS shall assume, negotiate and administer labor and other contracts* necessary for the day-to day operation of the city bus system and the city special transit service in a lawful fashion. *Because OTS is an independent contractor, the city shall not, except to the extent mandated to comply with federal law, assert control over the day-to-day employment or labor relations of OTS.*

(Emphases added.) As noted above in ROH § 28–1C.2 and Sections 2.1 and 7.2 of the management agreement, the transit management services contractor, OTS, is the employer of the bus personnel and maintains the exclusive right to manage labor relations and to negotiate collective bargaining agreements. OTS operates two primary divisions: 1) fixed route public bus transportation (the bus); and 2) point to point special transit service for qualified passengers with disabili-

ties as required by the Americans with Disabilities Act (Handi–Van).

Ordinance 96–30,[3] enacted as Article 8 of Chapter 13 of the ROH, codifies the agreement between OTS and DTS.

**13–8.4 Obligations and responsibilities of transit management services contractor.**

(a) Under the transit management services contract, the transit management services contractor, at a minimum, shall have the following general obligations and responsibilities:

. . . .

(10) *Operate the city bus system in accordance with routes, schedules and level of service established pursuant to Section 13–6.1* [.]

. . . .

**13–8.5 Obligations and responsibilities of department of transportation services.**

(a) Under the transit management services contract, the department of transportation services shall have the following general obligations and responsibilities:

. . . .

(2) Establish the routes, schedules, and levels of service for the city bus system as required under Section 13–6.1;

. . . .

(b) The department of transportation services may assume, under the transit management service contract, other obligations or responsibilities which are not contrary to this chapter.

*Under no circumstances, however, shall the department of transportation services assume any obligation or responsibility which may jeopardize the private employment status of bus or special transit service personnel and their coverage under the National Labor Relations Board.*

**13–8.6 Collective bargaining agreements with bus and special transit service personnel.**

3. Ordinance 96–30 was enacted in 1995 to require the private contractor to also provide spe-

cial transit services beginning in 1997.

(a) With respect to collective bargaining agreements with bus and special transit service personnel:

(1) *The transit management services contractor shall be the employer which shall have all responsibility and prerogatives of an employer,* as defined in 29 USC Section 152(2), in dealing with labor organizations;

(2) The transit management service contractor *shall advise the public transit authority of significant labor relations developments, but shall not be bound by any recommendations or advice of the department* [.]

(Emphases added.)

## II.

The parties do not dispute the facts following. Local 996 represents the employees of OTS. Two distinct bargaining units are contained in Local 996. One unit includes bus office and administrative employees. The second unit includes or consists of drivers, mechanics, and facility maintenance employees. Employees work at the OTS facility at Kalihi Palama or at Pearl City.

On February 11, 2003, DTS notified OTS that its fiscal budget for 2004 would be reduced from $142 million to $132,181,000. As a result, on April 21, 2003, DTS submitted to Local 996 a comprehensive contract which reflected the $10 million reduction.

On May 6, 2003, both parties entered into negotiations for a new labor agreement. The original contract expired on June 30, 2003. Unable to reach a new agreement, the parties agreed to a contract extension which continued OTS's operating and maintenance and clerical contracts on a day to day basis subject to a 72 hour strike notice. On August 22, 2003, Local 996 faxed to OTS a "72 hour strike notice," the strike to commence on Tuesday, August 26, 2003, at 12:01 am.

On August 22, 2003, OTS sent Local 996 a letter advising Local 996 that bus operators would be paid to complete their routes after the strike period began at midnight on August 26, 2003.

It has come to our attention the Teamster's Union has been advising its members to stop work precisely at 12:00 midnight regardless of whether a bus may still be in revenue service. We have been told that the Union has even planned a pickup program whereby union volunteers will pickup drivers around the Island and drive them back to their work site in private vehicles. This may be based on the mistaken assumption that drivers will not be paid for any work after midnight. The company wishes to be clear on this point: Drivers will be paid for all work performed, including any work after midnight, until such time as the buses return to the division.

Local 996 sent a response letter, advising OTS to be prepared to call buses in early so that passengers would not be stranded.

Prior to midnight on August 26, 2003, OTS recalled buses that were not expected to complete their routes until after midnight to avoid stranding passengers when the strike commenced. At approximately 11:45 pm on August 25, 2003, OTS sent its employees home and subsequently locked it gates. Members of Local 996 were on strike from August 26, 2003 until September 28, 2003. According to OTS no employees would have been allowed back to work during this time.[4]

On September 7, 2003, after five weeks of negotiations, members of Local 996 voted to ratify a new contract. Employees returned to work on September 29, 2003.

The DLIR estimated there was a rider loss of the following amounts:

| Week Ending | Total Number of Bus and Handi-Van Riders | Change in Total Number of Bus and Handi-Van Riders |
|---|---|---|
| 8/30/03 | 311,464 | -75.9% |
| 9/06/03 | 8,794 | -99.4% |
| 09/13/03 | 15,680 | -98.8% |
| 09/20/03 | 14,767 | -98.9% |
| 09/27/03 | 15,666 | -98.8% |

---

4. OTS reasoned that it would be difficult to uphold its duty to protect employees who crossed the picket line. Also, due to the integration of the operations, employees who desired to work during the strike would have little if anything to do.

### III.

Subsequently, members of Local 996 filed for unemployment compensation benefits for the five weeks during which they were on strike. In a decision mailed on October 10, 2003 by the DLIR Unemployment Compensation Division (Division), such benefits were denied pursuant to HRS § 383–30(4) (1993),[5] on the ground that the members had been involved in a work stoppage.

Local 996 filed an appeal from the Division's denial to the DLIR Appeals Referees' Office contending that there was no stoppage of work since OTS was not required to provide any fixed route transit services during the relevant time period. Local 996 argued the OTS only provided transit services as directed by DTS, and because DTS did not require such services, there was "factually no substantial curtailment of the Employer's business activities."

OTS filed for and was granted summary judgment by Appeals Referee Pamela Toguchi (Referee or the Referee), on April 8, 2004. The Referee apparently made findings that (1) during the strike, the employer did not provide fixed route services but maintained handi-van services, (2) in comparing the average weekly number of fixed routes for the period of August 25, 2002 to September 28, 2002 with the corresponding weeks during the strike in 2003 there was a reduction in ridership of 75.9%, 99.45%, 98.8%, 98.9%, and 98.9%, respectively. The Referee ruled that OTS's essential business function was the provision of public transportation services and that bus services during the strike were reduced by 75.9 to 99.4%. The pertinent portions of the Referee's decision stated as follows:

> Claimant's [ (Local 996's) ] position on administrative appeal is that summary judgment is inappropriate because there were material issues of fact as to what constituted the employer "business activity." They asserted that if the employer's business activity were defined as providing public transportation services as required by the government agency, and if the agency did not require or compel them to provide services during the strike, there would be no substantial curtailment of the employer's business activities. *According to claimant's theory, there would be no curtailment to business activity at all since the employer would not have been required to provide any general bus services whatsoever in that instance.* On that basis, claimants maintained summary judgment in the employer's favor was not appropriate, as there were unresolved material facts as to what direction or instructions the employer received form the government agency, if any, as to its operations during the strike
>
> . . . .
>
> ... *Even assuming the agency excused or even instructed the employer not to provide general bus service, the employer's essential function is to provide public transportation services.... It is clear that the employer's action not to provide fixed route services was directly and inextricably due to the parties labor dispute;* the employer would have otherwise continued to provide services if there was no strike....

(Emphasis omitted and emphases added.)

Local 996 then appealed to the court, reiterating the same argument it had presented to the Referee. *See supra.* On April 21, 2005, the court, citing this court in *Abilla v. Agsalud,* 69 Haw. 319, 741 P.2d 1272 (1987), stated that "a labor dispute includes a lockout" and is thus "not dispositive of the issue of whether Local 996 is entitled to unemployment insurance benefits." The court further determined that the Referee was not wrong in reaching her decision:

> The Court also finds, as did the Appeals Officer, that the parties are not disputing that there was a stoppage of public trans-

---

**5.** HRS § 383–30 (1993), entitled "Disqualification for benefits," states in relevant part:

> An individual shall be disqualified for benefits:
>
> . . . .

(4) Labor dispute. For any week with respect to which it is found that unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which the individual is or was last employed[.]

portation or bus service. In *Int'l [Bhd.] of [Elec.] Workers v. Hawaiian [Tel.] Co.*, 68 Haw. 316, 326, 713 P.2d 943, 952 (1986) [(hereinafter *IBEW*)], the court held "[a] 'stoppage of work' is a 'substantial curtailment' of the business activity at the employers establishment." Appellants [sic] argument is that the business activity of [OTS] was not the provision of public transportation or bus services "as directed by the City and County of Honolulu, Department of Transportation Services." The Court finds that *even if, as Appellants [sic] argue that the City and County informed OTS that it was not required to provide services, the Appeals Officer found that such instruction was generated by the notice of strike or a lockout decision,* and there is nothing to suggest that the appeals officer's finding was clearly erroneous or erroneous as a matter of law. (Emphasis added.) On May 17, 2005, Local 996 filed a notice of appeal to this court against both the DLIR and OTS.

### IV.

On appeal, Local 996 contends the court's determination that there was a "substantial curtailment of OTS's business activity" is unsupported by the record or "erroneous" as a matter of law because (1) the essential business activity of OTS is to provide bus services at the levels determined by DTS, (2) there was no "substantial curtailment of business activity" because DTS did not require OTS to provide bus services beginning August 26, 2003, and (3) therefore there was no "stoppage of work."

OTS responds that (1) the DLIR has broad discretion to implement rules to apply HRS chapter 383,[6] (2) there was no evidence presented to establish that DTS could change OTS business activity, and (3) there was no evidence presented to establish that DTS had

in fact directed OTS to change its basic business activity. The DLIR argues that the court correctly interpreted the law when it determined that OTS's essential business function was to provide bus services. Additionally, DLIR contends that Local 996 has raised a frivolous claim and asks that it be awarded attorney's fees and costs.

Local 996 asks that this court vacate the court's decision and remand the case back to the Referee's office with instructions to hold a hearing on the issue of whether DTS had advised OTS it was not required to provide bus services during the strike period. Local 996 requests, further, that if such an advisement is found to have been made, then this court make a determination that the disqualification in HRS § 383–30(4) not apply.

### V.

Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. "In an appeal from a circuit court's review of an administrative decision the appellate court will utilize identical standards applied by the circuit court." *Dole Hawaii Div.-Castle & Cooke, Inc. v. Ramil,* 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990). Questions of fact are reviewed under the "clearly erroneous" standard. *Wailuku Sugar Co. v. Agsalud,* 65 Haw. 146, 148, 648 P.2d 1107, 1110 (1982); HRS § 91–14(g)(5). "In contrast, an agency's legal conclusions are freely reviewable. An agency's interpretation of its rules receives deference unless it is plainly erroneous or inconsistent with the underlying legislative purpose." *IBEW,* 68 Haw. at 322, 713 P.2d at 950 (citation, internal quotation marks, and brackets omitted).

### VI.

When construing a statute such as HRS § 383–30(4), "the fundamental starting

---

**6.** HRS § 383–91 (1993), entitled "Duties and powers of department, director," provides in relevant part:

　(a) *The department of labor and industrial relations, herein referred to as the "department" shall administer this chapter through the director of labor and industrial relations* pursuant to chapter 371. The director may delegate to any person such power and authority, vested in

the director by this chapter, as the director deems reasonable and proper for the effective administration of this chapter, except the power to make rules or regulations.... The director may require such reports, make such investigations, and take such other action as the director deems necessary or suitable for the administration of this chapter. (Emphasis added.)

point is the language of the statute itself ... and where the statutory language is plain and unambiguous [the appellate courts'] sole duty is to give effect to its plain and obvious meaning." *State v. Kalama,* 94 Hawai'i 60, 63, 8 P.3d 1224, 1228 (2000) (internal quotation marks and citations omitted). As noted previously, HRS § 383–30(4) states that an individual shall be disqualified for benefits "for any week with respect to which it is found that unemployment is *due to a stoppage of work which exists because of a labor dispute* at the factory, establishment, or other premises at which the individual is or was last employed." (Emphasis added.) The parties do not dispute that there was a labor dispute. There can be no disagreement that OTS is the employer. ROH § 28–1C.2(2) provides that under the bus services management contract, OTS *"shall be the employer* of record of bus and special transit service personnel, *who shall be deemed employees of the [OTS].*" (Emphases added.) The parties apparently disagree on whether there was a "stoppage of work" within the meaning of HRS § 383–30(4).

 This court has interpreted "stoppage of work" to mean a "substantial curtailment of ... business activities at the employer's establishment[.]" *Inter-Island Resorts, Ltd. v. Akahane,* 46 Haw. 140, 148, 377 P.2d 715, 720 (1962). "In determining whether substantial curtailment has occurred, the test is whether a strike substantially curtails an establishment's essential function *or basic business activity.*" *IBEW,* 68 Haw. at 326, 713 P.2d at 952 (emphasis added).

 Local 996 argues that there was no "substantial [curtailment of] ... basic business activity" as required by *IBEW* because DTS did not require that OTS provide bus services beginning on August 26, 2003. Thus it suggests that the Referee and the court incorrectly held that OTS's essential business function was the provision of public transportation services.

It may be noted that ROH § 28–1C.1 grants DTS the "exclusive power to establish the routes, schedules, and levels of service of the City bus system." In that regard, ROH § 28–1C.4(10) states that OTS will "operate the city bus system in accordance with routes, schedules, and levels of service established by the public transit authority pursuant to § 28–1C.1." Therefore, Local 996 is correct in that OTS must provide public transit services at levels directed by DTS.

Nonetheless, the facts of this case fall within the scope of HRS § 383–30(4). As noted before, ROH § 28–1C.2 and the management agreement indicate that OTS is deemed the employer of the employees of the bus system with the responsibility of managing, operating and maintaining the transmit system, including labor relations.

Under ROH § 28–1C.2(a)(4), OTS's "basic business activity" was to manage, operate, and maintain the city bus system. As stated in ROH § 28–1C.2(a)(5), OTS "shall have no purpose, except the management, operation, and maintenance of the City bus system as an instrumentality of the City." The basic business activity of OTS, the employer, then, was the provision of bus services. According to the data accumulated by DLIR, there was a substantial curtailment of OTS's business activity during the strike. Hence, there was a stoppage of work conducted by the employer.

That the stoppage of work came about "because of a labor dispute," HRS § 383–30(4), would appear apparent. The phrase "because of" as ordinarily understood means "complementary to expressions of the notion of reason or cause[.]" *Webster's Third New Int'l Dictionary* 194 (6th ed.1961). As the Referee indicated, that the labor dispute was the reason or cause of the work stoppage was "clear." She determined that in the absence of a labor dispute "the employer would otherwise have continued to provide services[.]" The facts support the Referee's determination. The contract between OTS and Local 996 had expired in June 2003. As earlier noted, on August 22, 2003, Local 996 sent a 72–hour strike notice. On August 26, at the strike's inception, OTC shut down its services.

 Local 996 suggests in its opening brief that OTS's actions constituted a lockout. But in *Abilla,* this court determined that a work stoppage could be brought about by an employer's decision to "lock out" its

employees, thus disqualifying them from receiving benefits. 69 Haw. at 321, 741 P.2d at 1273. In that case, the employer took steps to close down as a defensive measure. Affirming the trial court, this court, interpreting HRS § 383–30(4), stated that a " 'labor dispute' covers '*any controversy concerning terms, tenure or conditions of employment,* or concerning the association or representation of person in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment[.]' " *Id.* at 330, 741 P.2d at 1278 (citation omitted) (emphasis added). Thus, applying the broad definition of "labor dispute," even if DTS "informed OTS that it was not required to perform services," the "instruction was generated by the notice of a strike or a lockout decision," as the court concluded. The measures employed by the employer in anticipation of a strike under the circumstances of this case, then, do not undermine the disqualification for unemployment benefits.

In a similar situation the Superior Court of Pennsylvania in *Bako v. Unemployment Comp. Bd. of Review,* 171 Pa.Super. 222, 90 A.2d 309, 314 (1952), affirmed the disqualification of unemployment benefits under section 402(d), 43 Pennsylvania Statutes 802.[7] In *Bako,* the steel company, in anticipation of the strike, began a gradual shutdown of its operations. *Id.* at 311. Rejecting Bako's [8] contention that the employees were eligible for benefits as a result of being laid off prior to the strike due to lack of work, the court stated:

> When a strike is imminent, when an employer has been *officially notified that a strike will occur,* and has reasonable grounds for a belief that the strike will actually take place, *he may, prior to and in anticipation thereof, take reasonably necessary measures to protect his property during the pendency of the strike.* The nature and extent of such measures depend upon the kind of work and the circumstances in which it is conducted, and ordinarily the board will not overrule the honest judgment of an employer.

*Id.* at 312 (emphases added). Similarly, OTS took defensive measures. After being served with the 72–hour notice of strike, and concerned that a walk-out would occur, OTS took several steps to protect its customers and its property. As indicated before, after failed negotiations with Local 996 to have bus operators complete routes following the commencement of the strike, OTS recalled all buses early. This was to ensure that passengers would not be stranded if bus operators "stopped work precisely at 12:00." *See supra.* By 11:45 pm, OTS had sent all employees home and locked its gates thereafter.

In *Ablondi v. Bd. of Review,* 8 N.J.Super. 71, 73 A.2d 262, 266 (App.Div.1950), the Superior Court of New Jersey determined that defensive measures employed by the employer did not affect the disqualification of employees from workers compensation under New Jersey Statutes § 43:21–5(d).[9] In *Ablondi,* the employer was in the business of processing fur skins, when the employees' collective bargaining agreement expired. *Id.* at 263. The fur skins took several weeks to process and once it had begun, processing had to be completed in the regular course to avoid spoiling. *Id.* at 264. Faced with a risk of spoilage due to the sudden cessation of work, the employer decided not to accept any new business; as a result no work was available. *Id.*

---

7. Section 402(d) is Pennsylvania's counterpart to HRS 383–30, is somewhat similar, and provides as follows:

An employee shall be ineligible for compensation for any week ... (d) in which his unemployment is *due to a stoppage of work, which exists because of a labor dispute (other than a lockout)* at the factory, establishment or other premise at which he is or was last employed. (Emphasis added.)

8. Bako was the representative for members of United Steelworkers of America, Congress of Industrial Organizations.

9. New Jersey Revised Statutes § 43:21–5(d) is similar to HRS § 383–30(4) and states in pertinent part:

An individual shall be disqualified for benefits:

. . . .

(d) *If it is found that this unemployment is due to a stoppage of work which exists because of a labor dispute at the factory,* establishment or other premises at which the individual is or was last employed. (Emphasis added.)

268

The appellants argued that they were unemployed due to a lack of work, rather than the labor dispute and therefore they were eligible for such benefits. Disagreeing, that court concluded

> the lack of work was directly attributable to the labor dispute and the temporary lay-offs did not, for purposes of the labor dispute disqualification clause, sever the employer-employee relationship ... notwithstanding the lay-offs the parties expected that when the labor dispute was terminated the employees would return to work at the employer's plant and, in fact, they did so.

*Id.* at 266. Similarly, Local 996 members apparently expected that when the labor dispute was terminated they would and in fact did return to work. As reported, *supra,* the lack of work was a result of the labor dispute. The *Ablondi* court further stated, "Indeed, it has been held that where employees are laid off for reasons wholly unrelated to any controversy and a later labor dispute prevents their scheduled resumption of work, the statutory disqualification applies fully during the subsequent period of work stoppage resulting from the labor dispute." *Id.* (citing *Abbott v. Appeals Bd. of Michigan Unemployment Comp. Comm'n,* 323 Mich. 32, 34 N.W.2d 542 (1948)). Here, it is evident that OTS's actions were related to the strike notice issued by Local 996.

Both *Bako* and *Ablondi* are persuasive. Thus, it is concluded that the court was not wrong in its conclusion that the Referee was correct in deciding that under HRS § 383–30 a "stoppage of work" resulted from a labor dispute.

### VII.

As to the question of whether DTS excused OTS from providing general bus service, or so instructed it, the labor dispute and interruption of bus services fell within the scope of HRS § 383–30(4) under the facts of

this case. As indicated previously, this is true notwithstanding that DTS may have advised or instructed OTS that bus services were not required, as both the Referee and court decided. Moreover, the ordinances and management agreement instruct that OTS shall have control over the events related to labor contracts. ROH § 28–1C.4(5)(a) states that "the bus management services contractor shall be the *exclusive negotiator* with the Hawaii Teamsters Local 996 as the exclusive bargaining representative of bus personnel, but *shall solicit and receive the advice of the public transit authority*[.]" (Emphases added.) ROH § 13–8.6 states that

> [w]ith *respect to collective bargaining agreements* with bus and special transit service personnel:
>
> (1) the transit management service contractor *shall be the employer which shall have all responsibilities and prerogatives of an employer,* as defined in 29 USC Section 152(2),[10] in dealing with labor organizations;
>
> (2) [OTS] shall advise the public transit authority of significant labor relations developments, *but shall not be bound by any recommendations or advice of the department.*

(Emphases added.) Section 7.2 of the management agreement specifically states that

> *OTS shall assume, negotiate, and administer labor and other contracts* necessary for the day-to day operation of the city bus system.... Because *OTS is an independent contractor, the city shall not, except to the extent mandated to comply with federal law, assert control over the day-to-day employment or labor relations of OTS.*

(Emphases added.)

The ordinances and management agreement, then, expressly establish that OTS is deemed the employer with respect to labor relations and exercises entire control over all labor contract negotiations. OTS is not "bound by any recommendations or advice"

**10.** Section 152(2) reads:

The term "employer" includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

of DTS. ROH § 13–8.6(2). As the management agreement states, the city, through DTS "shall not assert control over the ... labor relations of OTS." None of the parties claim that a breach of such provisions took place. Thus there is no reason to remand the case, as requested by Local 996, for a finding of fact as to whether DTS advised OTS to halt its services.

### VIII.

 DLIR argues that the Local 996 appeal is frivolous and moves for sanctions, including attorneys' fees and costs, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 38.[11] It is concluded that DLIR is not entitled to HRAP Rule 38 relief.

The term frivolous under HRAP Rule 38 has been defined as being "manifestly and palpably without merit so as to indicate bad faith on the pleader's part." *Coll v. McCarthy*, 72 Haw. 20, 29, 804 P.2d 881, 887 (1991) (citation, internal quotation marks, and brackets omitted). This court has stated that "an appeal may be frivolous when it merely restates arguments that the [trial] court properly rejected [or that] were so groundless as to be held sanctionable by the [trial] court." *Abastillas v. Kekona*, 87 Hawai'i 446, 449, 958 P.2d 1136, 1139 (1998) (brackets in original) (citing *Mestayer v. Wisconsin Physicians Serv. Ins. Corp.*, 905 F.2d 1077, 1081 (7th Cir.1990)). HRAP Rule 38 sanctions have been imposed in past cases where the "appellant has engaged in a pattern of frivolous and vexatious litigation," *id.*, or where appellants continued to acknowledge controlling authority contrary to their assertions. *Gold v. Harrison*, 88 Hawai'i 94, 107, 962 P.2d 353, 366 (1998), *cert. denied*, 526 U.S. 1018, 119 S.Ct. 1254, 143 L.Ed.2d 351 (1999).

This is the first case brought to this court contending that the "substantial curtailment" of business was caused by a third party. In *Gold*, Gold's claim was held to be frivolous when Gold failed to point to new evidence or case law which had not already been cited to

in the lower court. *Id.* at 107, 962 P.2d at 366. While Local 996 does restate arguments that both the referee and the court have properly rejected, no "controlling authority" contrary to the assertions being made existed. *Id.* Local 996 in apparent good faith argued that the essential business function of OTS was the provision of bus services "at levels" determined by the City. Thus, the appeal was not frivolous and attorneys' fees and costs are not justified.

### IX.

The court's April 21, 2005 final judgment is therefore affirmed.

---

11. HRAP Rule 38 states that "[i]f a Hawai'i appellate court shall determine that an appeal decided by it was frivolous, it may award damages

including reasonable attorney's fees and cost to the appellee."